# UNITED STATES *v.* UNITED STATES COIN & CURRENCY

No. 5.   Argued February 25–26, 1969—Reargued October 20, 1970—
Decided April 5, 1971

HARLAN, J., delivered the opinion of the Court, in which BLACK, DOUGLAS, BRENNAN, and MARSHALL, JJ., joined.   BLACK, J., filed a concurring statement, *post,* p. 724.   BRENNAN, J., filed a concurring opinion, *post,* p. 724.   WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART and BLACKMUN, JJ., joined, *post,* p. 730.

*Jerome M. Feit* argued the cause for the United States on the reargument. *Philip A. Lacovara* argued the cause for the United States, *pro hac vice,* on the original argument. On the brief were *Solicitor General Griswold, Assistant Attorney General Vinson, Francis X. Beytagh, Jr., Beatrice Rosenberg,* and *Lawrence P. Cohen.*

*Anna R. Lavin* reargued the cause for respondent. With her on the briefs was *Edward J. Calihan, Jr.*

*Charles Alan Wright, Marvin K. Collie,* and *Harry M. Reasoner* filed a brief for Joseph P. Lucia as *amicus curiae* on the reargument.

MR. JUSTICE HARLAN delivered the opinion of the Court.

After Donald J. Angelini had been convicted of failing to register as a gambler and to pay the related gambling tax required by federal law, 26 U. S. C. §§ 4411, 4412, 4901, the United States instituted the forfeiture proceeding to obtain $8,674 which Angelini had in his possession at the time of his arrest. The District Court for the Northern District of Illinois found that the money was being used in a bookmaking operation in violation of these internal revenue laws and ordered forfeiture under 26 U. S. C. § 7302 which provides:

> "It shall be unlawful to have or possess any property intended for use in violating the provisions of the internal revenue laws . . . and no property rights shall exist in any such property. . . ."

When the Court of Appeals affirmed, we granted certiorari, *sub nom. Angelini* v. *United States,* 390 U. S. 204, and remanded the case for further consideration in the light of our decisions in *Marchetti* v. *United States,* 390 U. S. 39 (1968), and *Grosso* v. *United States,* 390 U. S. 62 (1968), which precluded the criminal conviction of gamblers who properly assert

their privilege against self-incrimination as a ground for their failure to comply with these aspects of the gambling tax law. A unanimous panel of the Court of Appeals concluded that Angelini might properly assert his Fifth Amendment privilege in this forfeiture proceeding and ordered the return of the seized money. 393 F. 2d 499 (1968). Since the Court of Appeals for the Sixth Circuit subsequently came to the opposite conclusion,[1] we granted the Government's petition for certiorari in the present case, 393 U. S. 949 (1968), in order to resolve the conflict. The case was first argued at the 1968 Term and reargued at the current Term. We now affirm the decision below.

## I

The Government's principal argument turns upon an exceedingly narrow construction of our decisions in *Marchetti* and *Grosso*. In those cases, we took pains to make it clear that the Court in no way doubted the Government's power to assess and collect taxes on unlawful gambling activities. It was only the method Congress had adopted in collecting the tax that raised the Fifth Amendment question. The statute commanded that gamblers submit special registration statements and tax returns that contained information which could well incriminate them in many circumstances. Because the risk of self-incrimination was substantial, we held that a Fifth Amendment privilege could be raised as a defense to a criminal prosecution charging failure to file the required forms. Since it was only this method of tax collection which was subject to constitutional objection, we indicated that the Government remained free to collect taxes due under the statute so long as it

---

[1] *United States* v. *One 1965 Buick*, 392 F. 2d 672, rehearing denied, 397 F. 2d 782.

did not attempt to punish the taxpayer for his failure to file the required documents.

The Government now relies heavily on the fact that *Marchetti* and *Grosso* only held that "a claim of privilege precludes a *criminal conviction* premised on failure to pay the tax."[2] (Emphasis supplied.) It argues that just as it may collect taxes in a civil action, the Government may also initiate forfeiture proceedings—which are also formally civil in nature—without offending *Marchetti* and *Grosso*. But as *Boyd* v. *United States*, 116 U. S. 616, 634 (1886), makes clear, "proceedings instituted for the purpose of declaring the forfeiture of a man's property *by reason of offences committed by him*, though they may be civil in form, are in their nature criminal" for Fifth Amendment purposes. (Emphasis supplied.) From the relevant constitutional standpoint there is no difference between a man who "forfeits" $8,674 because he has used the money in illegal gambling activities and a man who pays a "criminal fine" of $8,674 as a result of the same course of conduct. In both instances, money liability is predicated upon a finding of the owner's wrongful conduct; in both cases, the Fifth Amendment applies with equal force. See also *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U. S. 693, 700 (1965).

The Government does not seriously contend otherwise. Instead it places great emphasis on the peculiar nature of the proceedings authorized under § 7302. *Boyd*, we are told, was only concerned with forfeitures which are imposed "by reason of offences committed by" the owner. 116 U. S., at 634. In the present action, however, the Government contends that the guilt of the owner of the money is irrelevant. The forfeiture statute, it is noted, simply authorizes confiscation of "any property

---

[2] *Grosso* v. *United States*, 390 U. S., at 70 n. 7; see also *Marchetti* v. *United States*, 390 U. S., at 41–42, 61.

intended for use in violating the provisions of the internal revenue laws"; it does not require that Angelini be the one who possessed the requisite intention. If, for example, Angelini had left the money in a bookmaker's office without having any reason to know that illegal activities would take place there, the Government reads the statute as permitting confiscation if it can be shown that the *bookmaker* used Angelini's money in illegal wagering activities. Since, under the Government's view, the guilt or innocence of the actual owner of the money is irrelevant in an action under § 7302, the Government urges that the present forfeiture should not be considered the result of a "criminal" proceeding for Fifth Amendment purposes.

If we were writing on a clean slate, this claim that § 7302 operates to deprive totally innocent people of their property would hardly be compelling. Although it is true that the statute does not specifically state that the property shall be seized only if its owner significantly participated in the criminal enterprise, we would not readily infer that Congress intended a different meaning. Cf. *Morissette* v. *United States,* 342 U. S. 246 (1952). However, as our past decisions have recognized, centuries of history support the Government's claim that forfeiture statutes similar to this one have an extraordinarily broad scope. See *Goldsmith-Grant Co.* v. *United States,* 254 U. S. 505 (1921); *United States* v. *One Ford Coupe,* 272 U. S. 321 (1926). Traditionally, forfeiture actions have proceeded upon the fiction that inanimate objects themselves can be guilty of wrongdoing. See *Dobbins's Distillery* v. *United States,* 96 U. S. 395, 399–401 (1878); *The Palmyra,* 12 Wheat. 1, 14 (1827). Simply put, the theory has been that if the object is "guilty," it should be held forfeit. In the words of a medieval English writer, "Where a man killeth another with the sword of John at Stile, the sword shall be forfeit as deodand, and

yet no default is in the owner." [3]   The modern forfeiture statutes are the direct descendants of this heritage, which is searchingly considered by Mr. Justice Holmes in a brilliant chapter in his book, The Common Law.[4]   The forfeiture action in the present case was instituted as an *in rem* proceeding in which the money itself is the formal respondent.   More remarkable, the Government's complaint charges the *money* with the commission of an actionable wrong.[5]

It would appear then that history does support the Government's contention regarding the operation of this forfeiture statute, as do several decisions rendered by the courts of appeals.[6]   But before the Government's attempt to distinguish the *Boyd* case could even begin to convince, we would first have to be satisfied that a forfeiture statute, with such a broad sweep, did not raise serious constitutional questions under that portion of the Fifth Amendment which commands that no person shall be "deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." Even Blackstone, who is not known as a biting critic of the English legal tradition, condemned the seizure

---

[3] Quoted from O. Holmes, The Common Law 23 (M. Howe ed. 1963).

[4] Holmes, *supra,* n. 3, Lecture 1.

[5] The libel charged that: "On one or more of the aforementioned dates . . . aforesaid respondents [*i. e.,* the money] had been used and were intended to be used in violation of the Internal Revenue Laws of the United States of America. . . .   WHEREFORE, FRANK E. McDONALD, United States Attorney for the Northern District of Illinois . . . prays . . . That aforesaid respondents be adjudged and decreed forfeited to the UNITED STATES OF AMERICA."   App. 5–6.

[6] *United States* v. *Bride,* 308 F. 2d 470 (CA9 1962); *United States* v. *One 1958 Pontiac Coupe,* 298 F. 2d 421 (CA7 1962); cf. *United States* v. *One 1957 Oldsmobile Automobile,* 256 F. 2d 931 (CA5 1958).

of the property of the innocent as based upon a "super-stition" inherited from the "blind days" of feudalism.[7] And this Court in the past has recognized the difficulty of reconciling the broad scope of traditional forfeiture doctrine with the requirements of the Fifth Amendment. See, *e. g.*, *Goldsmith-Grant Co.* v. *United States, supra.* Cf. *United States* v. *One Ford Coach,* 307 U. S. 219, 236–237 (1939).

We need not pursue that inquiry once again, however, because we think that the Government's argument fails on another score. For the broad language of § 7302 cannot be understood without considering the terms of the other statutes which regulate forfeiture proceedings. An express statutory provision permits the innocent owner to prove to the Secretary of the Treasury that the "forfeiture was incurred without willful negligence or without any intention on the part of the petitioner . . . to violate the law . . . ." 19 U. S. C. § 1618.[8] Upon this showing, the Secretary is authorized to return the seized property "upon such terms and conditions as he deems reasonable and just." It is not to be presumed that the Secretary will not conscientiously fulfill this trust, and the courts have intervened when the innocent petitioner's protests have gone unheeded. *United States* v. *Edwards,* 368 F. 2d 722 (CA4 1966); *Cotonificio Bustese, S. A.* v. *Morgenthau,* 74 App. D. C. 13, 121 F. 2d 884 (1941) (Rutledge, J.). When the forfeiture statutes are viewed in their entirety, it is manifest that they are intended to impose a penalty only upon those

---

[7] 1 W. Blackstone, Commentaries, c. 8, *300.

[8] Although this statute appears in Title 19, regulating forfeitures under the customs laws, 26 U. S. C. § 7327 provides that: "The provisions of law applicable to the remission or mitigation by the Secretary or his delegate of forfeitures under the customs laws shall apply to forfeitures incurred or alleged to have been incurred under the internal revenue laws."

who are significantly involved in a criminal enterprise.[9] It follows from *Boyd, Marchetti,* and *Grosso* that the Fifth Amendment's privilege may properly be invoked in these proceedings.[10]

## II

The Government next contends that in any event our decisions in *Marchetti* and *Grosso* should not be retroactively applied to govern seizures of property taking place before these decisions were handed down on January 29, 1968. It is said that in reliance on the Court's earlier decisions in *Kahriger* and *Lewis,*[11] which upheld the validity of the gambling tax and registration require-

[9] It is noteworthy that the libel instituted by the United States made claim to the $8,674 because "a business was being *operated by Donald Angelini,* in violation of [the gambling tax provisions]," App. 5 (emphasis supplied), and that the evidence introduced at trial was consistent only with this theory of liability.

[10] In the present case, the Government has not suggested that the Fifth Amendment provides Angelini with a defense only with respect to his failure *to file* the required registration and tax forms, and that the gambler's failure *to pay* the required tax may still be punished consistently with *Marchetti* and *Grosso.* This argument was properly abandoned by the Solicitor General on reargument in *Marchetti* and *Grosso,* see Brief for the United States on Reargument 37–41, *Marchetti* v. *United States* and *Grosso* v. *United States, supra,* and we held in *Grosso* that, "[a]lthough failures to pay the excise tax and to file a return are separately punishable under 26 U. S. C. § 7203, the two obligations must be considered inseparable for purposes of measuring the hazards of self-incrimination which might stem from payment of the excise tax." 390 U. S., at 65. Similarly, *Marchetti* ruled that: "The statutory obligations to register and to pay the occupational tax are essentially inseparable elements of a single registration procedure." 390 U. S., at 42–43, and see n. 3. Consequently, it appears clear that the Fifth Amendment provides gamblers in Angelini's position with a complete defense.

[11] *United States* v. *Kahriger,* 345 U. S. 22 (1953); *Lewis* v. *United States,* 348 U. S. 419 (1955).

ments, "$6,686,098.22 worth of money and property has been seized under 26 U. S. C. 7302." Brief for the United States 32–33. The Solicitor General concedes, however, that this figure overestimates the Government's stake in the retroactivity question since "there are no reliable statistics indicating what percentage [of the property seized] was eventually returned to claimants" who proved to the Secretary of the Treasury that they were not significantly involved in criminal gambling activities. *Id.,* at 33. Nevertheless, the Government contends that simply because some litigation may be anticipated as gamblers attempt to reclaim their property, the retroactive effect of the new rule should be limited.

We cannot agree. Unlike some of our earlier retroactivity decisions, we are not here concerned with the implementation of a procedural rule which does not undermine the basic accuracy of the factfinding process at trial. *Linkletter* v. *Walker,* 381 U. S. 618 (1965); *Tehan* v. *Shott,* 382 U. S. 406 (1966); *Johnson* v. *New Jersey,* 384 U. S. 719 (1966); *Stovall* v. *Denno,* 388 U. S. 293 (1967). Rather, *Marchetti* and *Grosso* dealt with the kind of conduct that cannot constitutionally be punished in the first instance. These cases held that gamblers in Angelini's position had the Fifth Amendment right to remain silent in the face of the statute's command that they submit reports which could incriminate them. In the absence of a waiver of that right, such persons could not properly be prosecuted at all.

Given the aim of the *Marchetti-Grosso* rule, it seems clear that the Government must be required to undergo the relatively insignificant inconvenience involved in defending any lawsuits that may be anticipated. Indeed, this conclusion follows *a fortiori* from those decisions mandating the retroactive application of those new rules which substantially improve the accuracy of the

factfinding process at trial.[12]   In those cases, retroactivity was held required because the failure to employ such rules at trial meant there was a significant chance that innocent men had been wrongfully punished in the past.   In the case before us, however, even the use of impeccable fact-finding procedures could not legitimate a verdict decreeing forfeiture, for we have held that the conduct being penalized is constitutionally immune from punishment. No circumstances call more for the invocation of a rule of complete retroactivity.[13]

*Affirmed.*

MR. JUSTICE BLACK concurs in the Court's judgment and the opinion so far as it goes.   He would go further and now overrule *Linkletter* v. *Walker,* 381 U. S. 618 (1965), and its progeny.

MR. JUSTICE BRENNAN, concurring.

I join the opinion of the Court.   The dissent would have us hold that the Government may continue indefinitely to enforce criminal penalties against individuals who had the temerity to engage in conduct protected by the Bill of Rights before the day that this Court held the conduct protected.   Any such holding would have no more support in reason than it does in our cases.

---

[12] See, *e. g., Roberts* v. *Russell,* 392 U. S. 293 (1968); *McConnell* v. *Rhay,* 393 U. S. 2 (1968); *Arsenault* v. *Massachusetts,* 393 U. S. 5 (1968); *Berger* v. *California,* 393 U. S. 314 (1969).

[13] In the view of the writer of this opinion, the fact that this case had not become final by the time of this Court's decisions in *Marchetti* and *Grosso* suffices, without more, to require rejection of the Government's contention respecting nonretroactivity. See, *e. g., Desist* v. *United States,* 394 U. S. 244, 256 (HARLAN, J., dissenting), and *Mackey* v. *United States, ante,* p. 675 (HARLAN, J., concurring in judgments and dissenting).

## I

Frank recognition of the possible impact of retroactive application of constitutional decisions on the administration of criminal justice has led this Court to establish guidelines to determine the retroactivity of "constitutional rules of criminal procedure." *Stovall* v. *Denno,* 388 U. S. 293, 296 (1967). Since "[e]ach constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice," the "retroactivity or non-retroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based." *Johnson* v. *New Jersey,* 384 U. S. 719, 728 (1966). But although "[t]he extent to which a condemned practice infects the integrity of the truth-determining process at trial is a 'question of probabilities,' " *Stovall* v. *Denno,* 388 U. S., at 298, quoting *Johnson* v. *New Jersey,* 384 U. S., at 729, as a general matter "[w]here the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial which substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect." *Williams* v. *United States, ante,* at 653. "Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances." *Ibid.*\*

---

\*The few cases in which we have recognized that a new constitutional rule may in some circumstances improve the accuracy of the factfinding process, while at the same time denying retroactive application to that rule, do not in my view undercut the force of these statements. The relevant cases are collected and discussed in an Appendix to this opinion, *infra,* p. 728.

The reasoning that underlies these guidelines is clear. The States and the Federal Government have, of course, a legitimate interest in the evenhanded enforcement of such sanctions as they desire to impose upon any conduct that they may constitutionally prohibit. By definition a "new rule of criminal procedure" casts no doubt upon the power of government to punish certain conduct, but only upon the legitimacy of the process by which persons were found to have engaged in that conduct. Of course a government has no legitimate interest in upholding an unconstitutional system of criminal procedure. But accepting the results that an unconstitutional procedure has reached in the past does not uphold such a system for the future. Notwithstanding the new procedural rule the government retains a legitimate interest in sanctioning conduct that it may constitutionally prohibit. Accordingly, when a new procedural rule has cast no substantial doubt upon the reliability of determinations of guilt in criminal cases, we have denied the rule retroactive effect where a contrary decision would "impose a substantial burden [of retrials] upon the . . . judicial system . . . while serving neither to redress knowing violations of [constitutional rights] nor to protect a class of persons the government has no legitimate interest in punishing." *Williams* v. *United States, ante,* at 664 (BRENNAN, J., concurring in result); see *Desist* v. *United States,* 394 U. S. 244 (1969). But since the government has no legitimate interest in punishing those innocent of wrongdoing, cf. *Thompson* v. *Louisville,* 362 U. S. 199 (1960), when a new procedural rule casts doubt upon the reliability of a substantial proportion of past convictions obtained without its protections, we have required the new rule be given full retroactive effect. *Williams* v. *United States, ante,* at 653. From this it follows *a fortiori* that a decision holding certain conduct beyond the power of government

to sanction or prohibit must be applied to prevent the continuing imposition of sanctions for conduct engaged in before the date of that decision. For the decision does far more than cast doubt upon the reliability of the guilt-determining process. It makes the question of reliability irrelevant, for it establishes beyond peradventure that the government has no legitimate interest in punishing such conduct at all. See *Ex parte Siebold,* 100 U. S. 371, 376–377 (1880). Accordingly, it may no longer continue to punish it.

## II

The dissent seeks to explain its view of this case on the ground that even after this Court has declared certain individual conduct beyond the power of government to prohibit, the government retains an "interest in maintaining the rule of law and in demonstrating that those who defy the law do not do so with impunity" by punishing those persons who engaged in constitutionally protected conduct before it was so declared by this Court. *Post,* at 735. This argument, of course, has nothing whatever to do with the rule of *law.* It exalts merely the rule of judges by approving punishment of an individual for the *lèse-majesté* of asserting a constitutional right before we said he had it. In light of our frequent reiteration that the usual mode of challenging an unconstitutional statute is *expected to be violation of the statute* and adjudication of the constitutional challenge in a criminal proceeding, see, *e. g., Douglas* v. *City of Jeannette,* 319 U. S. 157, 163 (1943); *Dombrowski* v. *Pfister,* 380 U. S. 479, 484–485 (1965), it is difficult to see how this argument amounts to more than a flat statement that those who assert their constitutional rights before we have declared them may not do so with impunity.

If the dissent today means what it says, it would appear to follow that Virginia might keep in jail interracial married couples whose only offense was cohabitation within the State, so long as the cohabitation was prior to *Loving* v. *Virginia,* 388 U. S. 1 (1967); or that Arkansas could still discharge school teachers who taught evolution before we struck down the relevant statute in *Epperson* v. *Arkansas,* 393 U. S. 97 (1968). Of course the dissenters would never uphold such action. But if there is any distinction between these cases and the case at bar, it can only be that Angelini is asserting his privilege against self-incrimination, rather than a right under the First or Fourteenth Amendment. Whatever may be the relevance of the source of a new constitutional rule in determining the extent to which it affects the reliability of the factfinding process at trial, however, there is no justification for allowing the government greater power to vindicate its nonexistent interest in enforcing an unconstitutional statute that punishes assertion of the privilege against self-incrimination than to vindicate its interest in enforcing a statute that punishes the assertion of any other constitutional right.

## APPENDIX TO OPINION OF BRENNAN, J., CONCURRING

Our cases show little deviation from the principle that new constitutional rules of criminal procedure that affect the integrity of the factfinding process will, in general, be retroactively applied. In *Tehan* v. *Shott,* 382 U. S. 406 (1966), we denied retroactive effect to *Griffin* v. *California,* 380 U. S. 609 (1965), despite our recognition that the privilege against self-incrimination which *Griffin* protected did in some circumstances serve as an adjunct to truth. 382 U. S., at 414–415, n. 12, quoting *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964). But in *Tehan* we noted specifically that the privilege

against self-incrimination is not primarily "an adjunct to the ascertainment of truth," 382 U. S., at 416, and emphasized as well that retroactive application of *Griffin* would, in the States concerned, "have an impact upon the administration of their criminal law so devastating as to need no elaboration." *Id.*, at 419. Similarly, in *Johnson* v. *New Jersey,* 384 U. S. 719 (1966), we denied retroactive effect to *Escobedo* v. *Illinois,* 378 U. S. 478 (1964), and *Miranda* v. *Arizona,* 384 U. S. 436 (1966), notwithstanding our recognition that the principles announced in those cases would in some circumstances guard against the possibility of unreliable confessions. 384 U. S., at 730. But we emphasized in *Johnson* that strict pre-*Miranda* standards were available to those desiring to test the admissibility of confessions, *ibid.*, as well as pointing out the severe impact that retroactivity would have on state criminal processes. *Id.*, at 731–732. In *Stovall* v. *Denno,* 388 U. S. 293 (1967), we denied retroactive effect to *United States* v. *Wade,* 388 U. S. 218 (1967), and *Gilbert* v. *California,* 388 U. S. 263 (1967), because of uncertainty about the frequency with which violation of the rule there announced would actually result in injustice, the availability of a due process standard to remedy at least the more serious injustices, and the "unusual force of the countervailing considerations." *Stovall* v. *Denno,* 388 U. S., at 299. Finally, in *DeStefano* v. *Woods,* 392 U. S. 631 (1968), we denied retroactive effect to *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and *Bloom* v. *Illinois,* 391 U. S. 194 (1968), holding respectively that the States must afford criminal defendants a jury trial on demand in serious criminal cases, and that the right to jury trial extends to trials for serious criminal contempts. As to *Duncan,* retroactivity was denied because we considered that there was little likelihood that bench trials, as a whole, would be unfair, and because retroactive application could in some States

reopen every conviction for serious crime. 392 U. S., at 633–634. As to *Bloom,* we recognized that one ground for the result was "the belief that contempt trials, which often occur before the very judge who was the object of the allegedly contemptuous behavior, would be more fairly tried if a jury determined guilt." *Id.,* at 634. But the firm tradition of nonjury trials in contempt cases, combined with the adverse impact of retroactivity on the administration of justice, combined to persuade us that *Bloom* should be applied prospectively only. *Id.,* at 634–635. In addition, it should be noted that this Court has not been hesitant to reverse contempt convictions because of the possibility of involvement on the part of the judge. See *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971), and cases cited.

Examination of these cases, therefore, indicates that in all cases save *DeStefano/Bloom,* we regarded as relatively small the likelihood that noncompliance with the new rule would have resulted in serious injustice in any past cases. Moreover, in all cases save *Tehan* and *DeStefano/Duncan,* alternative methods were still available to those who could demonstrate that the feared injustice had in fact resulted. Taken in combination, these factors lead me to conclude that the cases discussed in this Appendix do not undercut the force of the proposition at issue.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE BLACKMUN join, dissenting.

## I

None of Angelini's rights under the Fifth Amendment were violated when this forfeiture proceeding was begun and concluded in the District Court. In violation of the Internal Revenue Code, Angelini had failed to register as a gambler and to pay the related gambling tax; he

was subject to criminal penalties for the default; and *United States* v. *Kahriger,* 345 U. S. 22 (1953), and *Lewis* v. *United States,* 348 U. S. 419 (1955), had specifically held that the statutory obligation to file and pay was not compulsory self-incrimination proscribed by the Fifth Amendment. The Amendment at that time afforded Angelini no defense either to a criminal charge for refusal to register and pay or to a forfeiture proceeding based on the same offenses.

After affirmance of the forfeiture judgment in the Court of Appeals, however, our decisions in *Marchetti* v. *United States,* 390 U. S. 39 (1968), and *Grosso* v. *United States,* 390 U. S. 62 (1968), intervened. *Kahriger* and *Lewis* were overruled. Obligatory filing and payment were held violative of the Fifth Amendment. It followed that failure to comply with the statute thereafter could not be punished by law. Angelini now claims the benefit of the new constitutional doctrine announced by *Marchetti-Grosso.*

Of course, we are not free to set aside convictions or forfeitures at will. The forfeiture judgment imposed here must stand unless the Constitution otherwise commands. More specifically, we are empowered to set aside the judgment only if we are constitutionally compelled to give *Marchetti* and *Grosso* retroactive application.

It is now firmly settled that the Constitution does not require every new interpretation of the Bill of Rights to be retrospectively applied. The cases from *Linkletter* v. *Walker,* 381 U. S. 618 (1965), to *Williams* v. *United States, ante,* p. 646, prove at least this much. They also squarely hold that retroactive sweep of newly announced constitutional doctrine is not required where violation of that doctrine raises no substantial doubts about the factual accuracy of guilty verdicts rendered under previous law. But if the new rule is such that

its nonobservance in the past casts substantial doubt on the reliability of prior convictions, all prior verdicts involving such a violation must be set aside regardless of countervailing arguments about the impact on state and federal interests in maintaining criminal judgments.

So far, the Court and I are apparently in complete agreement. But I cannot join the Court in its disposition of this case. The majority's reasoning is simple: If we are required to apply retroactively any new constitutional interpretation casting serious doubt on the accuracy of prior verdicts, we are also compelled to set aside convictions or penalties based on conduct that subsequent decisions—expressly contrary to prior decisions of this Court—hold to be constitutionally protected. If verdicts may not stand where the new rule casts doubt on the integrity of prior trials, surely, it is argued, a judgment such as the one against Angelini must be set aside because there should never have been a trial at all.

But this approach is no more than a beguiling verbalism. There is no doubt in this case that Angelini failed to register, file his returns, and pay his tax; nor is there any suggestion that either Angelini's conviction or the instant forfeiture proceedings were in any way unfair or departed from controlling norms. The argument here is not that new constitutional insight raises doubts whether Angelini committed the acts giving rise to the forfeiture or the accuracy of the procedures employed in determining whether he acted as charged; rather, it is that the forfeiture judgment must be set aside because based on conduct which *Marchetti-Grosso* have declared to be constitutionally immune. As Angelini would have it, complete retroactivity must always be given to decisions invalidating on constitutional grounds any substantive criminal statute. Any statute

defining criminal conduct, if declared unconstitutional, is void *ab initio*.

I fail to find any such command, express or implied, in the Fifth Amendment or in any other provision of the Constitution. Nor does the Court care to explain the result it reaches. It does not embrace the theory that the Constitution must be understood always to have meant what the Court now says it means. It does not deny that this Court makes constitutional law. Nor does it assert that prior interpretations of the Constitution were never valid law and must always be disregarded. But apparently a statute making certain conduct criminal, once invalidated here, was never the law although this Court formerly held that it was and had regularly affirmed convictions under it over explicit constitutional challenge. I am not prepared to agree with this proposition.

## II

Had Angelini registered and paid the federal tax and then been tried prior to *Marchetti-Grosso* for violating federal interstate gambling laws or state laws making gambling a crime, the admissions contained in his registration and gambling tax returns would have been relevant and presumptively reliable evidence of guilt, properly admissible under *Kahriger* and *Lewis*. And if after *Marchetti-Grosso*, Angelini had complained about the use of this evidence, *Tehan* v. *Shott*, 382 U. S. 406 (1966), and *Johnson* v. *New Jersey*, 384 U. S. 719, 732 (1966), would surely dictate denial of relief whether Angelini came here on direct review of his conviction or from denial of collateral relief.

If we would not upset a conviction where Angelini registered and filed tax returns and these filed statements were used against him in a criminal prosecution,

neither should we implement the *Marchetti-Grosso* reading of the Fifth Amendment by applying it where there has been no self-incrimination but a conviction or forfeiture for failure to register or pay the tax. In *Mackey* v. *United States, ante,* p. 667, it seems to me that a major predicate for permitting Mackey's gambling tax returns to be used against him in a criminal prosecution was that those returns were not compelled admissions— that Mackey's Fifth Amendment rights were not violated by the statutory requirement to register, file returns, and pay the gambling tax, for that issue was controlled by *Kahriger* and *Lewis,* not by *Marchetti* and *Grosso.* Angelini is in no better position than was Mackey to argue successfully that the registration statute was invalid when he decided to ignore it or that the statute called for "compelled" incriminating admissions. To urge that the integrity of the forfeiture proceeding against Angelini is destroyed because *Marchetti-Grosso* forbade any forfeitures at all is merely to reassert or assume that those decisions must be given retroactive effect. In terms of implementing the purpose of *Marchetti* and *Grosso* and the Fifth Amendment, I see no difference between convictions or forfeitures for noncompliance with the statute and those obtained by using the fruits of compliance with that same statute. Angelini's funds were validly and accurately forfeited for failing to file his returns contrary to a statute that this Court had upheld as consistent with the Fifth Amendment. Relief to Angelini would merely remove retroactively a burden on conduct, which when judged by current cases, was an exercise of his self-incrimination privilege, but which when it occurred and under the then-controlling law was a breach of duty he was legally bound to perform.

## III

It is true that if this judgment of forfeiture were affirmed the law would countenance a penalty for past criminal acts that are wholly innocent under the current law. It is also true that when the law no longer censures certain acts, the Government surrenders its interest in deterring prior delinquents or the public generally from engaging in a particular form of conduct that once was criminal but is now unobjectionable behavior. But there remains the interest in maintaining the rule of law and in demonstrating that those who defy the law do not do so with impunity. Clearly, the Constitution does not require the authorities to vindicate this interest upon the demise of a criminal law and some of us may think it unwise to do so. But is the interest so insubstantial that the Constitution forbids a State or the Federal Government from continuing to punish behavior which was once but is not now criminal conduct? I think not.

The question is an old one for both courts and legislatures and my answer is not novel, either in the context of the repeal of a criminal statute or in the context of a court decision overruling a prior case with respect to the constitutionality of a statute.

The common law never attached complete retrospectivity to the repeal of a criminal statute. Absent statutory guidance, the judge-made rule was that those whose convictions had been finally affirmed when repeal took place received no benefit from the new rule; but repeal of a statute abated pending prosecutions and required reversal of convictions still on appeal when the law was changed. *United States* v. *Chambers,* 291 U. S. 217 (1934); *Massey* v. *United States,* 291 U. S. 608 (1934); *United States* v. *Tynen,* 11 Wall. 88 (1871); *Yeaton* v. *United States,* 5 Cranch 281 (1809); *In re Kline,* 70

Ohio St. 25, 70 N. E. 511 (1904); *State* v. *Addington,* 2 Bailey (S. C.) 516 (1831); *Ex parte Andres,* 91 Tex. Cr. R. 93, 237 S. W. 283 (1922); see also 1 Sutherland, Statutory Construction § 2046 (1943 ed.).

The courts nevertheless honored provisions in repealing statutes saving prosecutions and forfeitures for conduct committed while the former statute was in effect. *The Irresistible,* 7 Wheat. 551 (1822); 1 Sutherland, *supra,* § 2050. Moreover, in 1871, Congress enacted the following general statute which, among other things, saved ongoing criminal prosecutions from abatement following repeal of a penal statute:

> "[T]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability." 16 Stat. 432.

This section was carried forward and eventually broadened by amendment "to provide that the expiration of a temporary statute shall not have the effect of preventing prosecution of an offense committed under the temporary statute" by making "applicable to violations of temporary statutes the same rule that is now in effect in respect to offenses against statutes that have been repealed." H. R. Rep. No. 261, 78th Cong., 1st Sess., 1 (1943).[1] Today, 46 States, as well as the Federal Gov-

---

[1] In a letter to the Speaker of the House of Representatives in support of this broadening amendment, Attorney General Biddle referred to the common-law rule as a "deficiency [which] has been cured as concerns offenses cognizable under a statute that has been expressly repealed, as distinguished from one that expires by its own terms." See H. R. Rep. No. 261, 78th Cong., 1st Sess., 1 (1943). He then indicated that there was doubt about whether

ernment, make provision for saving pending criminal prosecutions from the repeal of the underlying statute.[2] The prevailing legislative policy and positive law thus

the general saving provision identical to that enacted in 1871 (by then 1 U. S. C. § 29 (1940 ed.)) applied to violations of temporary statutes that expired before prosecutions could be concluded. The Attorney General next stated that a number of wartime statutes of a temporary nature had been enacted, and that to forestall questions about their enforceability after expiration "it appears desirable to enact legislation which would expressly permit prosecutions after the lapse of such temporary statutes for violations committed while the act is in force." H. R. Rep. No. 261, *supra,* at 2.

[2] The 46 States are: Alabama: Ala. Code, Tit. 1, § 11 (1958); Alaska: Alaska Stat. § 01.05.021 (1962); Arizona: Ariz. Rev. Stat. Ann. §§ 1–246, 1–247 (1956); see also *id.,* §§ 1–244, 1–249; Arkansas: Ark. Stat. Ann. § 1–103 (1947); California: Cal. Govt. Code § 9608 (1966); Colorado: Colo. Rev. Stat. Ann. §§ 135–1–7, 135–4–7 (1963); Connecticut: Conn. Gen. Stat. Rev. § 54–194 (1968); Florida: Fla. Const., Art. 10, § 9; Georgia: Ga. Code Ann. § 26–103 (1953); Hawaii: Hawaii Rev. Laws § 1–11 (1968); Idaho: Idaho Code § 67–513 (1947); Illinois: Ill. Rev. Stat., c. 131, § 4 (1969); Indiana: Ind. Ann. Stat. §§ 1–303, 1–307 (1967); Iowa: Iowa Code § 4.1 (1) (1971); Kansas: Kan. Stat. Ann. § 77–201 (1969); Kentucky: Ky. Rev. Stat. § 446.110 (1962); Louisiana: La. Rev. Stat. § 24:171 (1950); Maine: Me. Rev. Stat. Ann., Tit. 1, § 302 (Supp. 1970–1971); Maryland: Md. Ann. Code, Art. 1, § 3 (1957); Massachusetts: Mass. Gen. Laws Ann., c. 4, § 6 (1966); Michigan: Mich. Comp. Laws § 8.4a (1948); Minnesota: Minn. Stat. § 645.35 (1967); Mississippi: Miss. Code Ann. § 2608 (1957); Missouri: Mo. Rev. Stat. § 1.160 (1969); Montana: Mont. Rev. Codes Ann. § 43–514 (1961); Nebraska: Neb. Rev. Stat. § 49–301 (1968); Nevada: Nev. Rev. Stat. § 169.235 (1968); New Hampshire: N. H. Rev. Stat. Ann. § 21:38 (1955); New Jersey: N. J. Rev. Stat. § 1:1–15 (1937); New Mexico: N. M. Const., Art. 4, § 33; New York: N. Y. Gen. Constr. Law § 94 (1951); North Carolina: N. C. Gen. Stat. §§ 164–4, 164–5 (1964); North Dakota: N. D. Cent. Code § 1–02–17 (1959) (saves penalties, fines, liabilities, or forfeitures incurred under a repealed statute and provides that the repealed act remains in force for the purpose of enforcing such fines, penalties, or forfeitures; however, unless the repealing statute expressly provides otherwise, in cases tried both before and after the repeal, the repealing statute has the effect

is that neither the repeal of a statute nor the expiration of a temporary act shall release or extinguish penalties, forfeitures, or liabilities incurred under statutes no longer in force. Conduct perfectly innocent under current law is nevertheless punishable if it occurred while a valid criminal statute proscribed it. The courts have

---

of "extinguishing any jail or prison sentence that may be, or that has been, imposed by reason of said law . . . ." *Ibid.;* but see *In re Chambers,* 69 N. D. 309, 285 N. W. 862 (1939), where the court held that insofar as § 1–02–17 purported to extinguish prison sentences imposed after trial which preceded the effective date of the repealing statute, the section was unconstitutional under N. D. Const. § 76, which vests power to pardon in the Governor and the board of pardons); Ohio: Ohio Rev. Code Ann. § 1.20 (1969); Oklahoma: Okla. Const., Art. 5, § 54; Oregon: Ore. Rev. Stat. § 161.040 (1967); Rhode Island: R. I. Gen. Laws Ann. § 43–3–23 (1956); South Dakota: S. D. Compiled Laws Ann. § 2–14–18 (1967); Tennessee: Tenn. Code Ann. § 1–301 (1955); Utah: Utah Code Ann. § 68–3–5 (1968); Vermont: Vt. Stat. Ann., Tit. 1, § 214 (Supp. 1970); Virginia: Va. Code Ann. § 1–16 (1950); Washington: Wash. Rev. Code § 10.01.040 (1956); West Virginia: W. Va. Code Ann. § 2–2–8 (1966); Wisconsin: Wisc. Stat. § 990.04 (1967); Wyoming: Wyo. Stat. Ann. § 8–21 (1957).

Of the four other States, Delaware has a provision but it applies only to save prosecutions for any offenses committed under laws repealed when the State's comprehensive Code of 1953 was adopted. Del. Code Ann., Tit. 1, § 104 (1953). See also Pa. Stat. Ann., Tit. 46, § 596 (1969), a general saving provision applicable only to repeal of "civil provisions." However, under Pa. Stat. Ann., Tit. 46, § 582, if the repeal of a penal statute is accompanied by a re-enactment at the same time of the repealed law's provisions in "substantially the same terms," a prosecution will be saved. See *Commonwealth v. Davis,* 4 Pa. D. & C. 2d 182 (1954). Tex. Pen. Code, Art. 14.16 (1952), provides: "The repeal of a law where the repealing statute substitutes no other penalty will exempt from punishment all persons who may have violated such repealed law, unless it be otherwise declared in the repealing statute." But Tex. Pen. Code, Art. 17.19 saves prosecutions for offenses committed under statutes repealed when the new Penal Code took effect. South Carolina apparently has no general saving provision applicable to criminal prosecutions.

regularly enforced 1 U. S. C. § 109, the federal saving statute, never suggesting that it was constitutionally infirm or even fundamentally unfair and frankly recognizing that the Government is free to maintain the integrity of the law by insisting that those who violate it suffer the consequences.[3]

---

[3] *United States* v. *Reisinger,* 128 U. S. 398 (1888) (enforcing one of the predecessors of 1 U. S. C. § 109); *Allen* v. *Grand Central Aircraft Co.,* 347 U. S. 535, 553–555 (1954); *Moorehead* v. *Hunter,* 198 F. 2d 52 (CA10 1952); *Lovely* v. *United States,* 175 F. 2d 312, 316–318 (CA4 1949); *Rehberg* v. *United States,* 174 F. 2d 121 (CA5 1949); *Ladner* v. *United States,* 168 F. 2d 771 (CA5 1948). 1 Sutherland, Statutory Construction § 2048 (1943 ed.). See also *Fleming* v. *Mohawk Wrecking & Lumber Co.,* 331 U. S. 111, 119 (1947); *Duffel* v. *United States,* 95 U. S. App. D. C. 242, 221 F. 2d 523 (1954); cf. *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 331–333 (1936); *United States* v. *Hark,* 320 U. S. 531 (1944) (reversing an order quashing an indictment charging violation of maximum price regulation that had been revoked prior to the date the indictment was returned on the ground that the statute under which the regulation was issued remained in effect after revocation). In *United States* v. *Chambers,* 291 U. S. 217 (1934), this Court was faced with the question of what effect repeal of the Eighteenth Amendment by the Twenty-first Amendment on December 5, 1933, would have on criminal prosecutions continued or begun under the National Prohibition Act after the repealing amendment had been ratified. In an opinion by Chief Justice Hughes, the Court applied the common-law rule of *Tynen* and *Yeaton* and held that pending prosecutions, including those still on direct review, would be abated. The question of whether the Twenty-first Amendment had any effect on convictions which had become final before the date of ratification was specifically reserved. 291 U. S., at 226. Thereafter, the courts of appeals held that defendants whose convictions had become final before the Twenty-first Amendment was ratified had to serve their sentences. *United States ex rel. Randall* v. *United States Marshal,* 143 F. 2d 830 (CA2 1944); *Odekirk* v. *Ryan,* 85 F. 2d 313 (CA6 1936); *United States ex rel. Cheramie* v. *Dutton,* 74 F. 2d 740 (CA5 1935), cert. denied *sub nom. United States ex rel. Cheramie* v. *Freudenstein,* 295 U. S. 733 (1935); *Rives* v. *O'Hearne,* 64 App. D. C. 48, 73 F. 2d 984 (1934); *Moss* v. *United States,* 72 F. 2d 30 (CA4 1934); *The Helen,* 72 F. 2d 772

Of course, the case before us does not involve the legislative repeal of an existing criminal statute but a construction of the Fifth Amendment by this Court contrary to past interpretations of that amendment and having the effect of barring enforcement of 26 U. S. C. § 7203 against those refusing to register as gamblers and pay the gambling tax. As to those persons, at least those failing to file and pay after January 29, 1968, 26 U. S. C. § 7203 may not constitutionally be enforced. Does such a declaration concerning a law which this Court had previously validated mean that the law was to this extent void from the moment it was enacted? If so, it would appear that not only should pending prosecutions abate, but also all previous convictions should be vulnerable to

(CA3 1934) (common-law rule of *Chambers* applied to a forfeiture); *United States ex rel. Benton* v. *Hill,* 72 F. 2d 826 (CA3 1934); *United States ex rel. Voorhees* v. *Hill,* 72 F. 2d 826 (CA3 1934); *United States ex rel. Nerbonne* v. *Hill,* 70 F. 2d 1006 (CA3 1934).

In *Chambers,* the Court rejected the Government's suggestion that the general saving provision—the predecessor of § 109—supported the continuation of prosecutions pending when the repealing amendment was ratified. The saving statute was discussed as passed in recognition of the principle that unless a repealed law is "continued in force by competent authority," 291 U. S., at 224, repeal halts enforcement. Congress had the power to propose the Twenty-first Amendment so as to include a saving provision, but not to vary the amendment's terms once it was adopted. Since as adopted the amendment gave Congress no power to extend the operation of the National Prohibition Act, which was deprived of its force by the action of the people in repealing the Eighteenth Amendment, the Court concluded that the general saving provision had no application. *Ibid.*

There can be no doubt that a Court which had just decided *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 U. S. 358 (1932), would consider the judiciary as "competent authority" to fashion a rule that a statute, though changed by interpretation, nevertheless remained in force and applicable to events that transpired before the change occurred. See nn. 6–7, *infra,* and accompanying text.

habeas corpus petitions alleging that petitioners are in custody pursuant to an unconstitutional law. Or should the statute validated by prior Court decisions be considered a valid law until the date of its invalidation and its demise treated as Congress treats the repeal of a statute?

Neither of these alternatives has found unqualified support in this Court. There are statements in the cases indicating that an unconstitutional law must be treated as having no effect whatsoever from the very date of its enactment. *Chicago, I. & L. R. Co.* v. *Hackett,* 228 U. S. 559 (1913); *Norton* v. *Shelby County,* 118 U. S. 425 (1886); *Ex parte Siebold,* 100 U. S. 371, 376 (1880).[4] But this view has not prevailed. In *Gelpcke* v. *City of Dubuque,* 1 Wall. 175, 206 (1864), the city issued bonds pursuant to legislative authorization that the Iowa Supreme Court had upheld as constitutional. The same court then overruled itself and held the statutory authorization to be void. This Court refused to allow the state court to give retroactive effect to the overruling decision by invalidating the bonds, saying that the legislature could not impair the obligation of an existing contract and that the same principle applies "where there is a change of judicial decision as to the constitutional power of the legislature to enact the law. To this rule, thus enlarged, we adhere. It is the law of this court." [5]

---

[4] In *Norton,* Mr. Justice Field declared:

"An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." 118 U. S., at 442.

[5] The Court so held over the dissent of Mr. Justice Miller who said:

"The Supreme Court of Iowa is not the first or the only court which has changed its rulings on questions as important as the one now presented. I understand the doctrine to be in such

*Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358 (1932),[6] was another indication that the Court clearly rejected any all-inclusive principle of retroactivity for court decisions declarative of a change in the law. In *Chicot County Drainage District* v. *Baxter State Bank*, 308 U. S. 371 (1940), this Court was faced with the question whether retroactive effect should be accorded an earlier decision declaring a federal statute unconstitutional, *Ashton* v. *Cameron County District*,

---

cases, not that the law is changed, but that it was always the same as expounded by the later decision, and that the former decision was not, and never had been, the law, and is overruled for that very reason. The decision of this court contravenes this principle, and holds that the decision of the court makes the law, and in fact, that the same statute or constitution means one thing in 1853, and another thing in 1859." 1 Wall., at 211.

See also *Loeb* v. *Columbia Township Trustees,* 179 U. S. 472, 492 (1900); *Douglass* v. *County of Pike,* 101 U. S. 677, 687 (1880).

[6] *Sunburst* rejected the claim that a state court could not constitutionally refuse to make its ruling retroactive. Mr. Justice Cardozo held:

"A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. Indeed there are cases intimating, too broadly, that it *must* give them that effect; but never has doubt been expressed that it *may* so treat them if it pleases, whenever injustice or hardship will thereby be averted. On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning. The alternative is the same whether the subject of the new decision is common law or statute. The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature." 287 U. S. 358, at 364–365 (citations omitted, footnotes omitted, emphasis in original).

298 U. S. 513 (1936). Referring expressly to *Norton,* Chief Justice Hughes stated that the broad language in that opinion "must be taken with qualifications." 308 U. S., at 374. As he asserted:

> "The actual existence of a statute, prior to [a deter-mination of unconstitutionality], is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the sub-sequent ruling as to invalidity may have to be considered in various aspects,—with respect to par-ticular relations, individual and corporate, and par-ticular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." *Ibid.*

This clear rejection of the idea that every decision declaring a statute unconstitutional had retroactive sweep was one of the underpinnings of *Linkletter* v. *Walker,* 381 U. S. 618, 622–629 (1965), and has been invoked since *Linkletter.*[7] It was against this background that

---

[7] See *City of Phoenix* v. *Kolodziejski,* 399 U. S. 204, 213–215 (1970); *Cipriano* v. *City of Houma,* 395 U. S. 701, 706 (1969); cf. *Tehan* v. *Shott,* 382 U. S. 406 (1966), where the prosecutor's com-ment about the defendant's failure to take the stand was authorized, when made, by Art. I, § 10, of the Constitution of Ohio and Ohio Rev. Code § 2945.43.

this Court has fashioned rules to deal with the impact on pending and closed criminal cases of decisions that overruled prior decisions construing the various provisions of the Bill of Rights. And it is against this background that I would reverse the judgment of the Court of Appeals.