**UNITED STATES of America,**
**Plaintiff,**

**v.**

**20 "DEALER'S CHOICE" MACHINES AND COIN CONTENTS OF $3.50,**
**Defendant.**

**Civ. A. No. 71–402.**

United States District Court,
D. South Carolina,
Florence Division.

April 28, 1972.

**1148**

Kermit S. King, King, & Brooks, Columbia, S. C., for defendant.

Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., for plaintiff.

## ORDER

CHAPMAN, District Judge.

This is an action by the United States of America for the condemnation of 20 "Dealer's Choice" mechanical poker machines by which the plaintiff asked that the machines be forfeited to the United States upon the grounds that they are coin operated gaming devices as defined in 26 U.S.C. § 4462(a) (1). This case was tried before this Court without a jury on April 24, 1972. Kenneth J. Brust and Donald A. Brust d/b/a "Dealer's Choice", a co-partnership, filed a Claim and Answer denying that the machines should be condemned and praying that the Court require the return of the machines in question to the claimants.

The defendants contend that the machines in question are not gaming devices, since the results obtained by a player are largely dependent upon the skill of the player, which may be obtained after practicing with the machines and developing certain techniques of play. The witnesses for the defendant demonstrated that skill can be developed in the playing of these machines. Dr. Roger Holmes, Dean of the Department of Engineering at the University of South Carolina, gave detailed testimony on the mechanics of the machine and Dr. John Williams, a specialist in engineering psychology at the University of South Carolina, testified as to the skills that could be developed in operating this machine. His testimony also produced certain graphs showing the learning curve for individuals operating the ma-chine and he felt that this was a game of skill rather than a game of chance, since the element of chance was reduced as the skill of the player increased.

After considering all of the testimony, the exhibits, examining the machines and hearing argument of counsel, I make the following Findings of Fact and Conclusions of Law as required by Rule 52(a) of the Federal Rules of Civil Procedure:

## FINDINGS OF FACT

1. Prior to August 19, 1970, the claimants, Donald A. Brust and Kenneth J. Brust were operating an informal partnership in a location at Myrtle Beach, South Carolina. This business operated under the name of "Dealer's Choice" and used 20 "Dealer's Choice" mechanical poker games. These games were machines numbered one through twenty, and each of the machines is the same in construction and use, except that the cards placed on the five reels within the machine vary with each machine.

On August 19, 1970, special agents of the Intelligence Division, Internal Revenue Service, seized the 20 machines for failure to pay taxes required to operate coin operated gaming devices. A claim and cost bond was posted and filed by the brothers Brust transferring proceedings to this court and thereafter the United States filed this action for forfeiture of the machines.

2. The claimants are leaseholders of the machines, but for all practical purposes they are owners and maintain complete control and possession of the machines. The purpose of the lease is to protect exclusive locations and areas for use of the machines.

3. The 20 devices seized are single unit machines bearing the name plate "Dealer's Choice", manufactured by Wolf Enterprises of Pennsauken, New Jersey. Each has a horizontal playing board with five buttons located thereon, together with two coin slots, one for dimes and one for quarters. Each ma-

chine is approximately two and a half feet in depth, two feet in width with the front one-half of the machine being approximately one foot in height and the rear one-half of the machine being approximately two and a half feet in height. Just behind the playing board the machine rises vertically and has a black glass front approximately 12 x 18 inches. There are five windows in this glass front, each window being about the size of an ordinary playing card. Each window is above one of the five buttons on the playing board. Behind each window is a reel, about one foot in diameter, with ten sides, to which ten ordinary playing cards are glued. Since ten cards are mounted on each of the five reels, there is a total of 50 separate playing cards. These cards represent a normal deck less two of the deuces. To operate the machine a person inserts a dime or a quarter. If a dime is inserted the value of the winning hand is as set forth hereinafter, but if a quarter is inserted, the value is increased by a multiple of three. On the drop of the coin, there is a delay of one to two seconds and then the five reels begin to turn. A light comes on to show that time has started to run for the player to begin his selection of what he hopes will be a good poker hand. As the reels rotate cards are displayed to the player through the five windows. The operator of the machine attempts to acquire a good poker hand by pressing the button to stop the rotating reel at the card of his choice. He does this in sequence until he has stopped all five reels. There is a timer which stops all reels after the expiration of a predetermined period, unless they have been sooner stopped by the player.

4. The timer is usually set at from 16 to 20 seconds on the machines when they are being used by unskilled persons. However, signs posted on the machines and displayed in the place of business indicate that the owners have the right to require "expert players" to play against a time limit of five seconds.

The owners are the sole judges of who will be classified an "expert player".

5. The reels rotate at 40 rotations per minute. The speed of the reel cannot be altered, so six and two-thirds cards per second pass the window of each of the five openings. The machine must be opened to change the timer down to five seconds, and players are notified when this is being done.

6. The reels rotate so rapidly that it is difficult to recognize each card as it passes. Aces are easily spotted and face cards can be distinguished, but with the machine operating it is practically impossible to tell whether a face card is a King, Queen or a Jack. Low cards can be distinguished from high cards by spot patterns, but the exact denomination of the card is usually impossible.

7. Prizes are given for certain combinations, and these prizes are graduated in value depending upon the value of the hand in a poker game. When playing for a dime the following is a list of the winning hands and the respective value of merchandise:

| Winning Hand | Value of Merchandise |
|---|---|
| Pair of Jacks or better | $ .20 |
| Two Pair | .40 |
| Three of a Kind | .60 |
| Straight | 1.00 |
| Flush | 1.60 |
| Full House | 2.00 |
| Four of a Kind | 4.00 |
| Straight Flush | 6.00 |
| Royal Flush | 10.00 |

Signs reflecting the above values are posted on the machines and throughout the premises. These values are increased three-fold when a quarter is inserted in the machine. If the player does not wish to receive the merchandise for a winning hand, he is given a coupon and may thereafter accumulate coupons and redeem their total for a higher valued item of merchandise. Prizes include stuffed animals, figurines, air rifles, small appliances, etc.

A light on the machine indicates whether the game is being played for a dime or a quarter. There is no way that the owner of the machine may change its operation during the play of a particular game, and the only way that the machine may be adjusted is by shortening the time interval from the beginning of play until the five reels are stopped either by the player or automatically by the timer.

8. It is possible for a player to develop his skill with the machine to a point where he will obtain a winning hand of at least a pair of Jacks on almost every try. Most people develop this skill by watching the Ace, determining the two or three cards in advance of the Ace and pressing the button at the proper time to stop the reel when the Ace is in the window. Since the cards are in a different sequence on each reel, it may take a number of games for a player to locate the Ace, or any other desired card, and develop his timing so as to stop the reel at the proper place.

The testimony showed that persons with no previous experience on the machine could develop a limited degree of skill in 20 to 30 games on the machine.

When the time for playing the game is reduced to approximately five seconds, it is practically impossible for even an expert player to play all five reels by pushing the button to select the desired card. Under these time limitations the expert players are usually restricted to pressing only two or three buttons before the machine automatically stops. Therefore, the experts are left to chance as to what cards may appear on the reels that are stopped by the automatic timer.

9. Once the five reels stop, the game is over. There is no opportunity to improve a hand by keeping cards that may appear on some of the reels and trying to improve the cards on other reels, as a person might "draw" to a poker hand.

Although with time, experience and experimentation with the machine a player may develop a certain skill, an element of chance is always present. This element is kept in the game by reducing the time for the better players.

## CONCLUSIONS OF LAW

Coin operated gaming devices are defined in 26 U.S.C. § 4462 as (1) "A so-called 'slot' machine which operates by means of the insertion of a coin token, or similar object and which, by application of the element of chance, may deliver, or entitle the person playing or operating the machine to receive cash, premiums, merchandise, or tokens . . ." Sub-paragraph (b) (1) of the same section excludes from "coin operated gaming devices" a "bona fide vending or amusement machine in which gambling features are not incorporated. . ." Under 26 U.S.C. § 4461 coin operated gaming devices are taxed at the rate of $250 per year for each device.

The defendants rely heavily upon Revenue Ruling 57–395 which states in part:

"The determination of whether a coin-operated device is an amusement or a gaming device cannot be made solely on the fact that prizes are awarded in connection with its operation. If the successful operation of a coin-operated device, with respect to which prizes are awarded, depends on the application of the element of chance, the machine is considered a gaming device. Generally, with respect to this type of device, the player, after inserting the coin in the machine, has no further control over the final result, which is attained by the element of chance, such as pulling a lever, setting reels into action, activity of dice, or, in the case of 'pin-ball machines', propelling the ball over the playing surface by means of a plunger.

On the other hand, when the insertion of a coin merely releases the machine for manual play, and the successful operation thereof depends entirely on the skill of the player in op-

erating the device, such as the propelling of pucks, the machine is considered an amusement device even though prizes may be awarded to some or all of the players."

Revenue Ruling 57–395 was applied to a type of shuffle-alley bowling game in which the insertion of a coin set up tenpins in the manner simulating a bowling game. Players propel the pucks by hand over the playing surface in order to attain scores similar to those in a regular bowling game. The ruling in effect held that the results of the game were "entirely" dependent upon the skill of the player. The "Dealer's Choice" machines depend on skill and chance and is not solely for amusement. The language of the court in the case of United States v. Two (2) "Exhibit Rotary" Coin Operated Gambling Devices, 107 F.Supp. 314 (W.D.Okl.1952) is appropriate to the present case. At page 316:

> ". . . it is apparent that where there is an element of chance that the person so operating the machine may or may not receive value for his money, either in property or money, and the device is not solely for amusement, then it is a 'gambling device'.

> This court does not attempt to lay down any hard and fast rule for determining whether or not any particular type of coin operated machines are or are not gambling devices, since it depends upon the particular machine and the purpose and design for which it was intended and manufactured. It is sufficient to say that the machines here involved are operated by the insertion of a coin, that the return of property depends both upon an element of skill and an element of chance, that the operator may or may not get a return for his money, and that although there may be some amusement in the operation of the machines they were purposely designed not for amusement solely but to attract the operator by the possibility of a 'prize' or 'reward' ".

In Holliday v. Governor of State of S. C., D.C., 78 F.Supp. 918 (3 Judge Court) affirmed, 335 U.S. 803, 69 S.Ct. 56, 93 L.Ed. 360, Judge Wyche defined a gambling machine at page 924 as: " . . These machines have all the elements of a gambling machine, namely, consideration, chance and prize. They do not give a certain uniform return value for each coin deposited. . ."

■ The expression "by application of the element of chance" used in Section 4462(a) (1) has been interpreted by Tooley v. United States, 134 F.Supp. 162 (D.Nev.1955) as requiring that there be a substantial element of chance involved in the play of the machine, but does not require that the element of chance predominate over the element of skill. In the operation of "Dealer's Choice" the element of chance is substantial and is kept substantial, even as the skill of the player increases, by shortening the time within which the game must be completed.

■ The defendants contend that "coin operated gaming devices" as mentioned in Section 4462 and partially explained in Revenue Ruling 57–395 are actually intended to include only the "one-armed bandit" type of machine, where the player inserts his coin, pulls a lever, and has no control over the outcome of the game. This argument is answered by Justice Black in United States v. Korpan, 354 U.S. 271, (1957) in which he explains the legislative intent and states at page 276, 77 S.Ct. 1099, at page 1102, 1 L.Ed.2d 1337:

> "If the respondent's position were adopted § 4462 (a) (2) would be restricted to a peculiar type of gambling device—the so-called "one-armed bandit"—even though ingenuity, a desire to avoid taxes, and technological progress provide a multitude of new devices which permit substantially the same kind of gambling but only with a different kind of coin-operated machine. We are convinced that Congress had no such purpose and meant only to distinguish between 'slot-machines' operated as gambling devices and 'slot-machines' which were used exclusively for amusement."

It is obvious from the facts and the law that the 20 "Dealer's Choice" machines are "coin operated gaming devices" under 26 U.S.C. § 4462.

■ Having decided that these "Dealer's Choice" machines are "coin operated gaming devices", the Court is faced with the defense of the Fifth Amendment to the United States Constitution. The claimants contend that if these machines violate the laws of the State of South Carolina or of the United States of America and claimants are required to register such machines and pay the special tax thereon, they are thereby compelled to provide self-incriminating information which could be used against them by the State or Federal Government. Their reliance is on Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) which held that a properly asserted Fifth Amendment privilege is a bar to criminal punishment for failure to file wagering excise tax returns (26 U.S.C. § 4401), failure to pay the wagering special occupation tax (26 U.S.C. § 4411), and failure to register as a person liable to pay the wagering special occupation tax (26 U.S.C. § 4412). These two cases have now been followed and the principles expanded in United States v. United States Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971). This case is often referred to as *Angeline* (the name of the person from whom the coin and currency was confiscated). In this most recent case Justice Harlan states at page 718, 91 S.Ct. at page 1043:

"The Government now relies heavily on the fact that *Marchetti* and *Grosso* only held that 'a claim of privilege precludes a *criminal conviction* premised on failure to pay the tax' (emphasis supplied). It argues that just as it may collect taxes in a civil action, the Government may also initiate forfeiture proceedings—which are also formerly civil in nature—without offending *Marchetti* and *Grosso*. But as Boyd v. United States, 116 U.S. 616, 634 [6 S.Ct. 524, 534, 29 L.Ed. 746] (1886), makes clear, 'proceedings instituted for the purpose of declaring the forfeiture of a man's property *by reason of offenses committed by him*, though they may be civil in form, are in their nature criminal' for Fifth Amendment purposes. (emphasis supplied). From the relevant constitutional standpoint there is no difference between a man who 'forfeits' $8,674 because he has used the money in illegal gambling activities and a man who pays a 'criminal fine' of $8,674 as a result of the same course of conduct. In both instances, money liability is predicated upon a finding of the owner's wrongful conduct; in both cases, the Fifth Amendment applies with equal force. See also One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 700 [85 S.Ct. 1246, 1250, 14 L.Ed. 2d 170] (1965)."

At page 721, 91 S.Ct. at page 1045 Justice Harlan continues:

"When the forfeiture statutes are viewed in their entirety, it is manifest that they are intended to impose a penalty only upon those who are significantly involved in criminal enterprise. It follows from *Boyd, Marchetti*, and *Grosso* that the Fifth Amendment's privilege may properly be envoked in these proceedings."

Section 5–621 of the Code of Laws of South Carolina 1962 makes it unlawful for a person to keep on his premises or operate certain slot machines. The "Dealer's Choice" machines in this case obviously violate this section and would subject the claimants in this case to the penalties of the statute which can total as much as one year in prison and a $500 fine. As indicated in *Marchetti*, supra, the privilege against self-incrimination assures that one may not be compelled to provide information which would provide a reasonable and appreciable and not merely imaginary and unsubstantial hazard that a significant

link in a chain of evidence would be established to prove guilt.

Obviously, to register these machines as coin operated gaming devices would be an admission that they violate the above South Carolina statute and would provide a "link in a chain of evidence" to prove the guilt of the operators. Under the circumstances I must find that the claimants are protected by the Fifth Amendment to the Constitution of the United States and that the complaint of the United States must be dismissed.

It is ordered, adjudged and decreed that the complaint of the United States be, and hereby is, dismissed; that the persons who have custody and possession of the 20 Dealer's Choice machines in question be and are hereby directed to return them to Donald A. Brust and Kenneth J. Brust or their authorized representatives.

And it is so ordered.