**Raymond J. RYAN and Helen Ryan, Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 76–2161.**

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1977.

Decided Dec. 15, 1977.

Rehearing and Rehearing In Banc Denied Feb. 27, 1978.

534

Raymond G. Larroca, Washington, D. C., for petitioners-appellants.

Myron C. Baum, Acting Asst. Atty. Gen., Charles E. Brookhart, Atty., Tax Div., Dept. of Justice, Washington, D. C., and Meade Whitaker, I. R. S., Washington, D. C., for respondent-appellee.

Before CUMMINGS and PELL, Circuit Judges, and MARSHALL, District Judge.*

* District Judge Prentice H. Marshall of the United States District Court for the Northern District of Illinois is sitting by designation.

MARSHALL, District Judge.

This is an appeal from a decision of the Tax Court holding taxpayer-appellants, Raymond and Helen Ryan, in contempt of court for refusing to answer seven interrogatories propounded by appellee, Commissioner of Internal Revenue. The issue is whether the Tax Court properly rejected the Ryans' claims of Fifth Amendment privilege, and of marital privilege. Additionally, we must decide whether the Tax Court property rejected the Ryans' contention that they need not answer because the interrogatories were the product of illegal governmental surveillance upon the Ryans, and deferred consideration of the Ryans' underlying claims of illegal governmental conduct until the hearing of the Ryans' motion to suppress. We hold that the court below ruled correctly and affirm its decision in all respects.

Before discussing the complex procedural history of this case and of the issues raised, it is appropriate to commend Judge Drennan of the Tax Court for his diligent efforts in administering this litigation. In a proceeding punctuated by stalls and appeals, he has exercised extraordinary patience in pressing for a trial over the course of this litigation, now in its eighth year.

A detailed recitation of the early course of the Tax Court proceedings would serve no purpose here. That history has been recounted in the opinion of the Tax Court and in a previous, premature appeal of this case, *Ryan v. C.I.R.*, 517 F.2d 13 (7th Cir. 1975). The following statement is sufficient.

In September, 1969, the Ryans filed a petition in the Tax Court for a redetermination of deficiencies in income taxes assessed by the Commissioner for the taxable years 1958 through 1962, 1964 and 1965. In order to obtain information about allegedly questionable dealings between the Ryans and a Swiss bank in a form admissible in Tax Court, the Commissioner spent several years attempting to take depositions of Swiss bank officials pursuant to an agreement between the United States and Switzerland, the Double Taxation Convention of 1951.

In 1972, while the Commissioner's efforts were proceeding, the Ryans filed a "Motion to Suppress and to Enjoin all Proceedings Based upon Evidence Illegally Obtained and Illegally Derived from Grand Jury Investigations of Petitioners" (motion to suppress). In this motion the Ryans alleged that federal agents had obtained damaging information by abusing grand jury process and by illegal searches and seizures of their papers. The Ryans then served subpoenas on several Internal Revenue Service (IRS) agents and other federal officials seeking information about any illegal electronic surveillance of the Ryans. The Commissioner moved to quash the subpoenas, and this motion was called for a hearing at the same time as the Ryans' motion to suppress. At a hearing on November 16, 1972, Judge Drennan tried to determine what facts, if proved, would justify suppression of evidence at trial. He sought to define the issues on any subsequent evidentiary hearing on the motion to suppress with sufficient clarity so that the evidentiary hearing would be manageable. Without making a final determination regarding the legal grounds for suppression, Judge Drennan limited the evidence at the suppression hearing to three topics: a meeting of the Commissioner's agents with Ryan Oil Company representatives in 1965, electronic surveillance of the Ryans, and illegal use of grand jury subpoenas by the Commissioner. Insofar as the motion sought to enjoin proceedings, it was denied on the grounds that the court lacked the power to enter such an order. Late in 1973, the Ryans moved to suspend the hearing on their motion to suppress until trial, apparently under the assumption that the trial would be held early in 1974. This motion was granted.

■ But on January 1, 1974, the new Rules of Practice and Procedure of the United States Tax Court (Tax Court Rules) became effective and set the stage for the instant appeal. These rules provide for discovery methods, including interrogatories to parties, similar to those of the Federal Rules of Civil Procedure. Without aban-

doning his attempt to secure information from the Swiss banking officials, the Commissioner served seven interrogatories upon the Ryans seeking information as to any relationships or transactions between the Ryans and the Commercial Credit Bank of Zurich, Switzerland, or with one Carl W. Hirschmann between 1958 and 1965.[1]

The Ryans objected to the interrogatories, resting on their constitutional privilege against self-incrimination. Rejecting the claim of privilege, the Tax Court granted the Commissioner's motion to compel answers. The Ryans appealed that order to this court. The appeal was dismissed for lack of jurisdiction because the order was not a final judgment. This court suggested that the proper avenue for appellate review of the order would be for the Ryans to risk a contempt citation. *Ryan v. C.I.R.*, 517 F.2d 13 (7th Cir. 1975).

In the meantime, the United States Attorney for the District of Columbia obtained an order in the United States District Court for the District of Columbia granting the Ryans use immunity in exchange for their testimony, pursuant to 18 U.S.C. §§ 6002 and 6003. This order directed the Ryans "to give testimony or provide other information and to produce documents which they refuse to give or to provide on the basis of their privilege against self-incrimination as to all matters about which they may be interrogated before the United States Tax Court." App. 23a–24a. The

Ryans appealed the order granting immunity to the Court of Appeals for the District of Columbia Circuit. That appeal was dismissed for lack of jurisdiction on the grounds that the order granting immunity was not a final, appealable order. *In re Ryan*, 176 U.S.App.D.C. 87, 538 F.2d 435 (1976). That court also noted that the proper method to litigate the validity of the immunity order would be through contempt proceedings, which would be subject to appellate review.

On remand, the Ryans persisted in their refusal to answer the interrogatories, asserting for the first time that the marital privilege justified their refusal to answer the interrogatories. The Tax Court set a hearing on August 18, 1976 to rule on the Ryans' claim of marital privilege and to determine what, if any, sanctions should be imposed against the Ryans. On the day of the hearing, the Ryans filed an 87 page brief entitled "Request that No Sanctions be Imposed upon Them and for Other Relief." This brief resuscitated the Fourth Amendment claims previously asserted in their motion to suppress, which they had previously urged be deferred until trial. This time, however, the Ryans asserted that the alleged illegal government conduct justified not only the exclusion of the tainted evidence at trial, but also justified their refusal to answer interrogatories.

Following a hearing, the Tax Court entered an order holding the Ryans in con-

---

1. The interrogatories were:

 Respondent requests that petitioners, jointly or separately, answer under oath, in accordance with Rule 71 of the Court's Rules of Practice and Procedure, the following interrogatories:

 1. Do you know Carl W. Hirschmann, of Zurich, Switzerland?

 2. Did you, on your own behalf or on behalf of others, have any business or financial dealings with him or with the Handelskredit Bank, A. G. Zurich, Switzerland (Commercial Credit Bank), during the years 1958 through 1965?

 3. During those years, what were Mr. Hirschmann's ownership and employee statuses with the Commercial Credit Bank?

 4. If your answer to 2 is affirmative, identify each such dealing by date of inception, general description or characterization, and party or parties for whom you were acting.

 5. In connection with any item identified in 4, did you enter into a Trehandkonto (Trust-Hand Agreement), and if so, identify each such item?

 6. Do you have in your possession, or under your custody or control, or available at your request or command any documents evidencing or relating to any item identified in 4?

 7. If your answer to 6 is affirmative, identify the documents and attach a copy of each to your answers or state the earliest date when they can be made available for inspection and copying.

 PLEASE TAKE NOTICE that a copy of such answers must be served upon the undersigned within 45 days after service of these interrogatories. App. 46a–47a.

tempt of court for their refusal to obey the earlier order that they answer the interrogatories. The Court imposed a fine upon Raymond Ryan. In its memorandum opinion, the Tax Court rejected the Ryans' Fifth Amendment claims because the Ryans had not established a reasonable apprehension that they would be prosecuted for any crime connected to the information sought in the interrogatories. Specifically, the Tax Court noted that the questions were innocuous, that no criminal prosecutions were then pending against the Ryans, and that the statute of limitations had run for any prosecutions for the years referred to in the interrogatories. Without passing on the validity of the immunity order, the Court said that the order supported its independent conclusion that the Ryans had nothing to fear from answering the interrogatories. Next, the Tax Court rejected the Ryans' claim of marital privilege because the privilege against adverse spousal testimony is only applicable in criminal proceedings. Finally, without ruling on the merits of the Ryans' claim of illegal governmental conduct, the Court held that these contentions, which were referred to as Fourth Amendment claims, were premature and should be raised in the Ryans' motion to suppress, scheduled for hearing at the time of trial. It is from the contempt order that the Ryans appeal.

After oral argument was held in this case, Raymond Ryan died and the Commissioner filed a suggestion of death of a party pursuant to F.R.A.P. 43(a). At our request, the parties have filed memoranda which take the position that the action is not moot but continues in full force with respect to appellant Helen Ryan and to the Estate of Raymond Ryan, since the civil contempt sanctions remain effective against them. The Tax Court has entered an order substituting the Estate of Raymond Ryan for Raymond Ryan. We agree with the parties and hold that the controversy is not altogether moot. *See Wetzel v. Ohio,* 371 U.S. 62, 83 S.Ct. 111, 9 L.Ed.2d 26 (1962) (Douglas, J., concurring). The Tax Court, however, also deemed it appropriate to impose a criminal sanction upon Raymond

Ryan alone and fined him $1,000 as punishment for his wilful disobedience of its orders. It may be that Mr. Ryan's death moots the imposition of this particular sanction. Death of a criminal defendant while his appeal is pending moots the prosecution and requires the appellate court to dismiss the appeal, vacate the judgment, and remand to the district court with instructions to dismiss the indictment. *United States v. Moehlenkamp,* 557 F.2d 126 (7th Cir. 1977). Nevertheless, because in this case the appeal from the civil contempt sanction continues to present a viable controversy, we find it unnecessary to decide whether the criminal sanction should be vacated as moot and leave that issue to the Tax Court. *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

### I. *Illegal Governmental Activity*

The Ryans' first contention is that they should not be compelled to answer the interrogatories because the very questions put to them by the Commissioner are the product of illegal activities by federal agents. They assert that there were three patterns of illegal governmental activity. First, they claim that over the years, federal agents planted electronic devices in the Ryans' telephone and intercepted conversations, and the information gleaned therefrom is linked to the interrogatories. Second, they claim that IRS agents improperly obtained information from sitting grand juries and by issuing false grand jury subpoenas, and that they utilized this information in developing the interrogatories. Third, they assert that IRS agents and customs agents obtained information through illegal searches and seizures of the Ryans' papers in violation of the Ryans' Fourth Amendment rights.

As stated above, Judge Drennan did not rule on the merits of these contentions, but held that he would decide them immediately prior to trial in the context of the Ryans' motion to suppress. Although the parties have addressed such thorny questions as whether the exclusionary rule of the Fourth Amendment is applicable to civil proceed-

ings in the Tax Court, *see Patrick v. United States,* 524 F.2d 1109, 1115 n.8 (7th Cir. 1975), we need not reach the merits of the claims of illegal governmental conduct if Judge Drennan's decision to defer ruling on these issues was correct. The question is one of timing.

Initially, it is clear that Judge Drennan had established an orderly method for disposing of the claim of illegal governmental conduct in a timely manner. At the hearing on the motion to suppress in 1972, he had narrowed and defined the issues to be tried at the evidentiary hearing. At the Ryans' request, the evidentiary hearing had been postponed until trial. When the Ryans interposed the grounds for suppression as an excuse for not answering interrogatories, they interfered with the orderly procedure established by the Tax Court. At no time did the Ryans request that the evidentiary hearing on the motion to suppress be held before their answers to interrogatories were due.

The interruption would have been justified, however, if the Ryans were correct in their assertion that they need not answer interrogatories which are the product of illegally obtained information. But the Ryans' position fundamentally misconceives the role of discovery in a civil proceeding and we reject their argument.

■ The basic premise underlying the discovery procedures of the Tax Court Rules like those of the Federal Rules of Civil Procedure, is that any matter which is relevant to the subject matter of a pending case is subject to discovery unless it is privileged. Tax Court Rule 70(b); *compare* Fed. R.Civ.P. 26(b)(1). A party may not object to discovery on the grounds that the information sought would not be admissible at trial, if that information appears reasonably calculated to lead to discovery of admissible evidence. Tax Court Rule 70(b); *compare* Fed.R.Civ.P. 26(b)(1). Furthermore, the court may, in the interest of justice, enter a protective order to protect a party from annoyance, embarrassment, oppression or undue burden or expense. Tax Court Rule 103; *compare* Fed.R.Civ.P. 26(c). The Ryans' claims of illegal governmental conduct do not fall within either of the two recognized limitations to the scope of discovery recognized in the rules, privilege and irrelevancy. Consequently, under the rules, the Ryans may not rely on their claims of illegal governmental conduct as an excuse for not answering the interrogatories.

■ The Ryans nevertheless complain that the Commissioner may use the interrogatories to "launder" illegally obtained information. This contention confuses the scope of discoverable information with the scope of information admissible at trial, and is entirely without merit. Tax Court Rule 70(d) provides that no information obtained through discovery shall be considered as evidence until offered and received as evidence. The answers to interrogatories, therefore, cannot be used for or against the Ryans in the Tax Court action unless they are independently determined to be admissible. And that question will be determined at the hearing on the Ryans' motion to suppress. Moreover, at oral argument in this court, the Commissioner took the position that any information obtained through the interrogatories would be within the scope of the motion to suppress. Therefore, if the Tax Court later accepts the Ryans' theory that an exclusionary rule should be fashioned to bar information obtained through illegal governmental conduct, the interrogatories could not be used to transform inadmissible evidence into admissible evidence.[2]

**2.** On remand, the Tax Court will be asked to decide whether the Fourth Amendment exclusionary rule is applicable to civil tax proceedings. The opinion in *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), particularly its criticism of *Suarez v. Commissioner,* 58 T.C. 792 (1972), should prove instructive. Additionally, the Tax Court should, in its evaluation of the Ryans' claim of abuse of grand jury process, take note that the Court of Appeals for the Ninth Circuit has withdrawn its opinion in *Simplot v. United States,* killed per order opinion vacated No. 76–183 (9th Cir. June 28, 1977), on which the Ryans heavily rely.

## II. *Fifth Amendment Privilege*

Second, the Ryans contend that the Tax Court erred in rejecting their claim that there was a reasonable danger of self-incrimination. They assert that the Tax Court wrongfully placed the burden of proving the possibility of a future prosecution upon them. The established rule is that the privilege against self-incrimination extends only to instances where the witness has reasonable cause to fear danger from answering the question. *Zicarelli v. New Jersey Investigation Comm'n,* 406 U.S. 472, 478, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972). The court, not the witness, must decide whether the witness's claim is justified and the court may order the witness to answer if it clearly appears that no danger of prosecution exists. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). The trial judge is in the best position to consider whether, in the particular factual circumstances, a responsive answer to the question or an explanation of why it cannot be answered could be harmful to the witness. *Zicarelli, supra,* 406 U.S. at 480–81, 92 S.Ct. 1670. Of course, he must be sensitive to the fact that the witness frequently cannot prove that his claim is legitimate without surrendering it. *Malloy v. Hogan,* 378 U.S. 1, 11–12, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Hoffman, supra,* 341 U.S. at 486–88, 71 S.Ct. 814.

The Ryans assert that the Tax Court overlooked several significant factors in rejecting the privilege for the reason that the likelihood of further prosecutions was too remote. First, Raymond Ryan had already been prosecuted three times for non-tax offenses relating to foreign transactions. Second, although the six-year statute of limitations for criminal tax prosecutions had expired for the period from 1958 to 1965, there was a continuing possibility that Ryan might be prosecuted for other criminal acts. Finally, even if the information elicited in the interrogatories was not damning in itself, it could lead to other information which, in turn, could lead to indictments for crimes still within the statute of limitations. These possibilities of prosecution still appear to be remote. But even assuming *arguendo* that the Ryans' fear of prosecution was reasonable, we accept the Commissioner's contention that the grant of immunity by the District Court for the District of Columbia is valid and is co-extensive with the scope of the privilege. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The grant of immunity obviates any question that Judge Drennan improperly rejected the Ryans' claim of privilege.

Against this obvious conclusion, the Ryans have raised a series of substantive and procedural reasons why the grant of immunity is invalid. None of them has any merit. First, the Ryans contend that the immunity order denied them due process of law because they were neither notified of a hearing on the immunity request nor given an opportunity to be heard before the order was entered. The Ryans rely on cases holding that the due process clause requires some kind of notice and some kind of hearing before a person may be deprived of a governmentally created property or liberty interest. *E. g., Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). These cases are inapposite. The procedural protections of the due process clause come into effect only if a person is threatened with deprivation of a property or a liberty interest. A grant of immunity does not infringe on any property or liberty interest of a witness. Rather, an immunity order is effectively an exchange of one safeguard for another. The witness relinquishes his privilege to remain silent and avoid incriminating himself and receives a promise from the government that the information he gives will not be used against him, directly or indirectly, in a subsequent criminal prosecution. As a matter of constitutional law, the witness suffers no detriment from an immunity order and therefore has no right to be heard.

Nor does the immunity statute, 18 U.S.C. §§ 6001–03, require that the wit-

ness be notified of a prospective grant of immunity, suggesting that no notice is required. *United States v. Leyva,* 513 F.2d 774, 776 (5th Cir. 1975). The absence of a statutory requirement that the witness be notified is consistent with the limited role of the court in issuing a grant of immunity. As this court recently noted, *In re Daley,* 549 F.2d 469, 479 (7th Cir. 1977), the immunity statute delegates the authority to obtain an immunity grant solely to the executive branch of government. The United States Attorney determines whether a grant of immunity is in the public interest, and the district court may not review that judgment. The court may only scrutinize the record to ascertain that a request for immunity complies with the procedural and jurisdictional requirements of the statute. In these circumstances, there is little need for an adversary hearing before the court approves a request for immunity, because the court is exercising a ministerial function. While nothing in the statute bars the court or the United States Attorney from notifying the witness, *see United States v. Taulbee,* 476 F.2d 804, 805 (9th Cir. 1973), or hearing any objections, *see In re Bonk,* 527 F.2d 120, 123 (7th Cir. 1975), these procedures are not required by the constitution or by the immunity statute. Moreover, at the contempt hearing before the Tax Court, the Ryans had an opportunity to raise every objection they could have raised at an immunity hearing. *In re Kilgo,* 484 F.2d 1215,

1221 (4th Cir. 1973); *United States v. Handler,* 476 F.2d 709, 714 n.6 (2d Cir. 1973).

Next, the Ryans complain that the government's procedures in obtaining the immunity order were defective in three respects.[3] First, they complain that the record does not affirmatively show that the Acting United States Attorney, Earl Silbert, personally decided to request the immunity order. The motion presented to the district court was signed for Silbert by an Assistant United States Attorney, Lester Seidel. Second, the record contains no affidavits. Third, the United States Attorney requested the immunity order after, not before the Assistant Attorney General had given his approval. Not one of these objections invalidates the immunity order. As for the signature, the statute has no requirement that the United States Attorney, rather than one of his assistants, personally sign the petition, although the statute does require that the United States Attorney must make the request. Since the motion for a grant of immunity was brought in the name of the United States Attorney, and the motion was signed in his name, it was in substantial compliance with the statute. *United States v. Silkman,* 543 F.2d 1218, 1220 (8th Cir. 1976). There is no suggestion that Assistant United States Attorney Seidel was acting outside the scope of his duties.[4]

**3.** The immunity statute, 18 U.S.C. § 6003, provides:

(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant

Attorney General, request an order under subsection (a) when in his judgment—
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

**4.** In *In re Di Bella,* 499 F.2d 1175 (2d Cir. 1974), the court suggested that the "wiser course" would be to involve the United States Attorney directly in an application to a district court for a grant of immunity. In that case, however, the initial request for the immunity grant was made by a Special Attorney attached to the Brooklyn Strike Force. The court may have been influenced by the fact that Strike Force attorneys, unlike Assistant United States Attorneys, are not directly supervised by the United States Attorneys. Instead, Strike Force attor-

The Ryans' second objection is that the record of the immunity hearing contains no affidavits of the United States Attorney or the Attorney General. The simple answer to this objection is that § 6003 does not require that a request for immunity be supported by affidavits or take any particular form. *In re Santiago,* 533 F.2d 727, 729 (1st Cir. 1976); *United States v. Smith,* 532 F.2d 158, 160 (10th Cir. 1976). The record here does contain letters demonstrating the approval of the Attorney General and the motion was signed in the name of the United States Attorney. That is sufficient.

Finally, the Ryans assert that according to the immunity statute, the United States Attorney must make the initial decision to seek an immunity order, and then must secure the approval of the Attorney General. The sequence of events was transposed in this case. First, Meade Whittaker, Chief Counsel of the Internal Revenue Service, asked the Assistant Attorney General to authorize the United States Attorney to seek the grant of immunity. The Assistant Attorney General agreed and wrote a letter to Earl Silbert, United States Attorney, authorizing him to obtain the order. Nothing in this order of events violates § 6003. The essential fact is that the United States Attorney and the Attorney General, or Assistant Attorney General agree on the need for the order before the United States Attorney files the motion in court, and that is what occurred here. *Di Bella, supra,* at 1177.

Additionally, the Ryans claim that the record does not contain facts showing that the prosecutor had any basis for making the judgment that the grant of immunity would be in the public interest. Since that judgment is entirely a matter for the executive branch, unreviewable by a court, there is no need for the record to contain any facts supporting the decision of the United States Attorney. *In re Daley, supra; In re Kilgo, supra,* at 1219. The Ryans also claim that the immunity order was improper because it was too broad and did not specify what questions would be asked of the Ryans. The fact that the immunity order was broad does not invalidate it; the scope of the use immunity afforded the witness corresponds with the scope of the information obtained from the witness. The breadth of the immunity order does not affect principles of relevancy or other evidentiary rules that will limit the admissibility of evidence at trial. Moreover, § 6003 does not require that the immunity order specify precisely what questions will be put to the witness.

Finally, the Ryans claim that since a tax fraud penalty could be imposed on them, they are not adequately protected by the immunity grant. They contend that the Fifth Amendment's ban on self-incrimination would bar the imposition of a fraud penalty pursuant to 26 U.S.C. § 6653(b) [5] on the basis of their compelled testimony, but since the immunity order only shields against the use of their testimony in a criminal case, they have no guarantee under the order that their testimony will not be used against them to establish fraud. Ultimately, they assert, their testimony could be used to impose a penalty which, though civil in form, is criminal in nature. This position, which erroneously assumes that the privilege is broader than the immunity grant, is without merit.

The Fifth Amendment states that "no person . . . shall be compelled in any criminal case to be a witness against himself." By its own terms, it ap-

---

neys are responsible to the Department of Justice.

**5.** 26 U.S.C. § 6653 provides:
*Failure to pay tax*
(b) *Fraud.*—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.

plies only to criminal cases. It is true that in some instances, the civil-criminal distinction is hard to ascertain. The Supreme Court has held that the privilege against self-incrimination may be invoked in a forfeiture proceeding against property intended for use in violating the provisions of the internal revenue laws under 26 U.S.C. § 7302. *United States v. United States Coin and Currency,* 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971). This holding, however, is predicated on the fact that the forfeiture statute, though civil in form, is only intended to impose a penalty upon those who are significantly involved in a criminal enterprise. 401 U.S. at 723, 91 S.Ct. 1041; *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 689, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). Therefore, the forfeiture penalty is closely related to a criminal sanction, and the privilege against self-incrimination is operative. The fraud penalty facing the Ryans, however, is a purely civil penalty. *Helvering v. Mitchell,* 303 U.S. 391, 401, 58 S.Ct. 630, 82 L.Ed. 917 (1938); *Plunkett v. C.I.R.,* 465 F.2d 299, 303 (7th Cir. 1972). It is not limited to persons involved in criminal activity and there is no need to probe behind the civil form of the proceedings to discern its true nature. Consequently, we reject the Ryans' assertion that § 6003 may not be used to secure evidence in a tax fraud deficiency action.

### III. *Marital Privilege*

 The Ryans next claim that they need not answer the interrogatories due to the marital privilege against adverse spousal testimony. This privilege, where recognized, permits each spouse to preclude the adverse testimony of the other and sometimes also permits each spouse to decline to testify against the other. *Hawkins v. United States,* 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); 8 Wigmore, *Evidence* §§ 2227–2245 (McNaughton rev. 1961). The Tax Court held that the privilege against adverse spousal testimony was only available in criminal cases and therefore was not applicable in civil tax proceedings. The Court also noted that the privilege had been subject to policy criticisms and that pro-

posed Federal Rule of Evidence 505 would have restricted the privilege to criminal cases. We agree that the privilege against adverse spousal testimony provides no screen to the Ryans, but in light of the arguments made on appeal, find it necessary to give our reasons in more detail.

As the Tax Court stated in its memorandum decision, the Internal Revenue Code provides that proceedings in the Tax Court shall be conducted in accordance with the rules of evidence applicable in trials without a jury in the United States District Court for the District of Columbia. 28 U.S.C. § 453. Since July 1, 1975, the Federal Rules of Evidence have been in effect in all United States District Courts. Rule 501 provides that the privileges of a witness shall be governed by principles of federal common law:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

 In determining whether the privilege should be recognized in this case, several principles are useful in interpreting the common law "in light of reason and experience." First, the Supreme Court has recognized that privileges must be narrowly construed because they block the judicial fact-finding function. "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct.

3090; 3108, 41 L.Ed.2d 1039 (1974). Second, it is important to decide whether the privilege is applicable taking into account the particular factual circumstances of this case. The intention of Congress in enacting Rule 501 was that "recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis." 1974 U.S.Code Cong. & Admin.News, p. 7059. *See United States v. Allery,* 526 F.2d 1362, 1366 (8th Cir. 1975). In making the case-by-case determination, it is helpful to weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case. *United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976). This court has refused to extend the marital privilege against adverse spousal testimony when it was unlikely that it was necessary to further its underlying rationale. *United States v. Doughty,* 460 F.2d 1360 (7th Cir. 1972).

The essential reason for the privilege against adverse spousal testimony is to foster family peace and harmony, for the benefit of husband, wife, children, and the public. *Hawkins, supra,* 358 U.S. at 77, 79 S.Ct. 136. If the communication is personal in nature, the privacy interests of husband and wife are also at stake. *United States v. Kahn,* 471 F.2d 191, 194 (7th Cir. 1972), *reversed on other grounds,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). The Ryans, who were married for about 40 years, realistically do not contend that recognition of the marital privilege would have been necessary to protect their marriage. They do not allege that the denial of the privilege would have had any effect on their marriage at all. Since the interrogatories do not seek information relating to intimate marital communications, no privacy interest of the Ryans is threatened. The Ryans' policy argument is that the privilege is necessary to avoid a distaste or repugnance for forcing one spouse to condemn the other through testimony. Since that distaste stems from the fear that forcing husband to speak against wife, or wife against husband will be likely to destroy the marriage, it is of little force here. Against any repugnance is a much more weighty policy—that in favor of fair and full enforcement of federal tax laws. *United States v. King,* 73 F.R.D. 103, 106 (E.D. N.Y.1976); *cf. United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Donaldson v. United States,* 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). The policy is particularly strong given the lumbering history of this case. The Ryans have resisted every attempt to wrest information about their income for the years in question, and have steadfastly refused to volunteer information. If some method to obtain the information other than through the interrogatories existed, it is likely that the Commissioner would have utilized it during the eight years that the action has been pending. Finally, we note that the actual harm which one Ryan's testimony would unleash upon the other is diminished by the grant of use immunity to both Ryans, precluding the use of the information in any subsequent criminal proceedings. *United States v. Doe,* 478 F.2d 194 (1st Cir. 1973).

As further support for overruling the Ryans' claim of marital privilege, the Commissioner argues that with rare exceptions, the privilege is only recognized in criminal cases. In *Hawkins, supra,* 358 U.S. at 77, 79 S.Ct. at 138, the Court preserved the privilege in a trial "where life or liberty is at stake." In *United States v. Van Drunen,* 501 F.2d 1393, 1396 (7th Cir. 1974), *cert. denied,* 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974), this court held that the privilege should be limited to cases where a "spouse . . . observes evidence of the other spouse's crime." Moreover, Proposed Federal Rule of Evidence 505, which was adopted by the Supreme Court but rejected by Congress, would have restricted the privilege to criminal cases. Proposed Rule 505 does provide some guidance in interpreting the scope of privileges under Rule 501. *United States v. King, supra,* at 105; 2

Weinstein's Evidence ¶ 501[01] at 501–20.5 (1977).[6]

We acknowledge that an argument can be made that no policy supports the distinction between allowing the privilege against adverse spousal testimony in criminal cases but not in civil cases. As one commentator put it,

> If it be said that there is a greater "repugnancy" in denying a man his life or liberty on the strength of his spouse's condemnation than is felt when only his property is at stake, it can also be argued that the least defensible and most "repugnant" aspect of the privilege is that which allows thieves and murderers to go free for such reasons of "sentiment." Reutlinger, *Policy, Privacy and Prerogatives: An Initial Examination of the Proposed Federal Rules of Evidence as They Affect Marital Privilege*, 61 Cal.L.Rev. 1353, 1384 (1973).

Indeed, the Advisory Committee's Note to Proposed Federal Rule of Evidence 505 fails to explain why the criminal-civil distinction was suggested, other than commenting that some states have adopted the distinction. A partial explanation could be that the privilege has the greatest societal value in criminal cases because it encourages the preservation of a marriage that might assist the defendant spouse in his or her rehabilitation efforts. *United States v. Van Drunen, supra,* at 1396. This rationale would not be applicable in a civil case.

■ Nevertheless, it is not necessary to fully defend the civil-criminal distinction in order to reject the marital privilege in this case. The independent policy reasons lead us to conclude that it should not be recog-

nized here. We adhere to this court's statement in the *Van Drunen* case that the privilege should be limited to instances in which it makes the most sense, where a spouse who is neither a victim nor a participant observes evidence of the other spouse's crime. 501 F.2d at 1397.

■ The Ryans assert that even if the marital privilege, as construed under the standard of reason and experience of Rule 501, is not applicable in this case, Rule 501 excepts Acts of Congress which provide otherwise. They contend that Congress has expressly preserved the marital privilege in civil cases in § 14–306(a) of the District of Columbia code. That section provides:

> In civil and criminal proceedings, a husband or his wife is competent but not compellable to testify for or against the other.

Unlike other sections of Title 14 of the District of Columbia Code, Proof, § 14–306(a) does not expressly state that it is applicable to federal courts in the District of Columbia.[7] If Congress had intended the husband-wife privilege of § 14–306(a) to apply to the federal courts in the District of Columbia, it could have clearly so provided. The Court of Appeals for the District of Columbia held that when the intended scope of a section of Title 14 is not specified, the court would not extend the section to federal courts and imply a rule for the federal courts of the District of Columbia which is different than that in other federal courts. *United States v. Hairston,* 161 U.S. App.D.C. 466, 495 F.2d 1046 (1974). We conclude that § 14–306(a) of the District of Columbia Code is not an act of Congress

---

**6.** The Ryans contend that we should disregard Proposed Rule 505 because it generated great controversy and was rejected by Congress because it limited the marital privilege. *See* S.Rep.No. 93–1277, 1974 U.S.Code Cong. & Admin.News, p. 7053. But the more likely source of dissension was not the choice to restrict the privilege against adverse spousal testimony to criminal cases, but rather the total elimination of the privilege protecting confidential marital communications. The latter privilege has not been the target of the intense criticism which has been leveled against the privilege against adverse spousal testimony. *Compare, e. g.,*

McCormick, *Evidence* § 66 (2d ed. 1972) (criticizing the privilege against adverse spousal testimony as "an archaic survivor of mystical religious dogma") *with Id.* § 78–86 (recognizing that a qualified privilege protecting confidential marital communications should be retained).

**7.** Two sections of Title 14 of the District of Columbia Code do provide that they shall apply to United States Courts for the District of Columbia. They are the physician-patient privilege, § 14–307, and the priest-penitent privilege, § 14–309.

providing otherwise within the meaning of Rule 501.

To summarize, we conclude that the Tax Court properly postponed its ruling on the Ryans' claim of illegal government surveillance because these claims would not excuse the Ryans from their duty to answer the interrogatories. The Tax Court properly rejected the Ryans' claim of the privilege against self-incrimination because the grant of use immunity removed the danger of self-incrimination. Finally, the Tax Court was correct in rejecting the privilege against adverse spousal testimony given the factual circumstances of this case.

No objection is made to the power of the Tax Court to impose contempt sanctions, or the choice of sanctions imposed. Accordingly, the judgment is affirmed and the cause is remanded to the Tax Court for further proceedings.