UNITED STATES of America, Plaintiff,

v.

PREMISES LOCATED AT HIGHWAY 13/5 PHIL CAMPBELL, ALABAMA (PARCEL 2), Premises Located at 207 West Washington St., Athens, Alabama (Parcel 4); Defendants,

Rose Marie Sharpe and Leland Sharpe, Claimants to Parcel 2,

Thomas Ray Smith and Andy Smith, Claimants to Parcel 4.

Civ. A. No. 89–AR–5451–NW.

United States District Court, N.D. Alabama, Northwestern Division.

Sept. 12, 1990.

Frank W. Donaldson, U.S. Atty., James D. Ingram, Asst. U.S. Atty., Birmingham, Ala., for U.S.

Charles N. Parnell, III, Judith Carmela D'Alessandro, Parnell Crum & Anderson, Montgomery, Ala., for Manufacturers Hanover Servicing, Inc.

Louie Lee Sims, Jr., Oliver & Sims, Alexander City, Ala., for Land, Phil Campbell, premises located at Highway 13/5 Phil Campbell, Ala.

William K. Hewlett, Hewlett Black & Marks, Tuscumbia, Ala., for Land, Tuscumbia, premises located at 2219 Woodmont Drive, Tuscumbia, Ala.

J. Stephen Salter, Birmingham, Ala., for Land, Athens, premises located at 207 West Washington Street, Athens, Ala.

Harvey B. Morris, Morris Smith Siniard Cloud & Fees P.C., Huntsville, Ala., J. Stephen Salter, Birmingham, Ala., for Thomas Ray and Andy Smith.

John E. Higginbotham, Higginbotham & Whitten, Florence, Ala., for Lyndon and Sandra Letson.

J. Paul Lowery, Montgomery, Ala., Louie Lee Sims, Jr., Oliver & Sims, Alexander City, Ala., for Leland and Rose Sharpe.

William K. Hewlett, Hewlett Black & Marks, Tuscumbia, Ala., for Robbie W. and Nancy Carol Johnson.

Gerald B. Hooper, Muscle Shoals, Ala., pro se.

Betty Jo Hooper, Muscle Shoals, Ala., pro se.

H. Thomas Heflin, Jr., Munsey Ford & Heflin, Tuscumbia, Ala., for Colonial Bank.

## MEMORANDUM OPINION

ACKER, District Judge.

The history and posture of the above-entitled case as of March 12, 1990, is outlined in *U.S. v. Premises Located at 207 W. Washington St.*, 732 F.Supp. 1128 (N.D. Ala.1990). There is no reason here to repeat what was said there. That opinion suffices as a background and starting point for this opinion.

Originally, the United States undertook to obtain the forfeiture of four widely separated parcels of real property situated within the Northern District of Alabama and alleged to have been used in illegal gambling operations. From the counties in which the parcels were originally alleged to be located, it would appear that Parcels 1, 2 and 3 are located in the Northwestern Division of this court, whereas Parcel 4 is located in the Northeastern Division. The complaint was filed in the Northwestern Division. On March 16, 1990, Thomas Ray Smith and Andy Smith, claimants to Parcel 4, withdrew their objection to the stay which had been granted at the government's request—probably the Smiths withdrew their objection because of this court's opinion of March 12, 1990—and on March 19, 1990, this court vacated the order which had set a "probable cause" hearing for March 30, 1990. The court reimposed the stay sought by the government but made it clear that a lengthy stay would not be tolerated. The court expressly stated:

> This stay shall not be indefinite. It shall be in effect until one of the claimants moves for a removal of the stay or until 4:30 P.M., June 29, 1990, whichever event first occurs.

(emphasis in original).

At an oral hearing that which preceded the order of March 19, the United States was made fully aware of the fact that it could not postpone the indictment of persons it believed to be guilty of criminal conduct for

an indefinite period while holding hostage these pieces of real property. The court suggested that if the United States had "probable cause" in September of 1989 (when the civil cover sheet was signed by the Assistant United States Attorney) to believe that this property, or any of it, had been used for illegal gambling, the United States, no later than June 29, 1990, certainly should have enough evidence to meet its burden of demonstrating "probable cause" to a grand jury. Time passed! The deadline of June 29, 1990 passed. After claimants' motions for summary judgment now under consideration were filed by the Smiths and by Rose Marie Sharpe and Leland Sharpe, claimants to Parcel 2, the United States asked for and was granted an extension within which to respond to the Rule 56 motions, and on August 30, 1990, before this opinion could be written but after the submission date, Andy Smith, one of the four claimants, was indicted by the United States on a charge of illegal gambling. None of the other three claimants has been indicted. The court speculates that one reason the United States asked for the extension is that it would be able to indict at least one claimant before this court could render an opinion on claimants' motions for summary judgment.

The United States had dismissed its claim to Parcel 3 prior to the opinion of March 12, 1990. On June 15, 1990, the United States voluntarily dismissed its claim to Parcel 1, asserting that the balance due on an outstanding mortgage exceeded Parcel 1's market value. This left only Parcel 2 and Parcel 4 in the case.

The words of the complaint have never tried to tie together any of the original four parcels or to explain why parcels so widely separated by geography and by ownership were named defendants in one proceeding. If multifariousness were still a serious law school subject, this complaint would provide a good example for classroom discussion. The United States obviously believes (and it may be correct) that *one hundred separate parcels*, connected in no way except by the fact that each was allegedly used at some time to facilitate an illegal gambling operation, can be named

*in rem* defendants in a single forfeiture proceeding, so long as the one hundred parcels are located within the same federal judicial district. The Northern District of Alabama contains 31 counties. With as many professional gamblers as are probably plying their trade within the Northern District of Alabama, theoretically, under the government's theory, a hundred separate parcels in one forfeiture action may be more than a *theoretical* possibility.

Parcel 4 was seized under a warrant of arrest which contained a legal description somewhat different from the description in the order of seizure of October 4, 1989, and the legal description was quite materially amended thereafter without any further order of seizure or *in rem* process. The pertinent procedural details will be explored more thoroughly in the later discussion of the applicable law. The United States has never attempted to justify or to explain its amendment of the legal description of Parcel 4 after the arrest warrant. Neither has it attempted to justify its not obtaining an amended arrest warrant or a new forfeiture order employing the substitute legal description. Lastly, it has not attempted to justify its failure to obtain a new order for publishing notice against Parcel 4 as finally described by metes and bounds.

After the deadline of June 29, 1990, without having heard anything from the United States, the court, on July 3, 1990, set the matter for a status and scheduling conference. At this conference, held on July 25, 1990, the court pointed out in no uncertain terms that both Parcels 2 and 4 had been seized in October of 1989, and that by order of October 4, 1989, title was tentatively vested in the United States without any pre-seizure hearing having been conducted and without the United States ever thereafter having formally charged any of claimants with involvement in an alleged illegal gambling business in violation of 18 U.S.C. § 1955. The court orally expressed severe reservations about the government's case in several respects.

On July 12, 1990, the Smiths filed their motion for summary judgment. On July

27, 1990, the Sharpes filed their motion for summary judgment. On August 2, 1990, the United States moved for its extension of the submission date, and with claimants not objecting, the extension was granted. In its motion for an extension, the United States said nothing about its intention to obtain an indictment during the period of the extension, but in its last-day response to claimants' motions for summary judgment filed on August 27, 1990, the United States revealed that it did intend to present a case to the grand jury against Andy Smith during the week of August 27. This court takes judicial notice of the subsequent fact that Andy Smith was indicted on August 30, 1990.

The Smith brothers own Parcel 4 together. The Sharpes, who are husband and wife, own Parcel 2 together. Both sets of claimants have paid the ad valorem taxes due on their respective properties. Of course, if the properties are legally owned by the United States, they are exempt from state, county, and municipal taxes. Since the seizure of Parcel 2, the Sharpes have made their regular mortgage payments due Manufacturers Hanover Bank, which holds a first mortgage on Parcel 2. Manufacturers Hanover has filed a claim in order to protect its lien. Colonial Bank, which holds a second mortgage on Parcel 2, has also filed a claim. It goes without saying that the titles to both parcels have been unmarketable since October 2, 1989. The Sharpes do have a written agreement with the United States by which they can remain in possession during this proceeding. The Smiths, who run a clothing store located in Parcel 4, have no such agreement, so that under this court's order of October 4, 1989, the United States can forcibly remove the Smiths from Parcel 4 at any time.

Claimants, who in this civil case can invoke Rule 56, F.R.Civ.P., if the rule is appropriate, make several arguments in support of their contentions that these undisputed material facts require a final disposition in their favor, divesting the United States of all right, title, claim and interest in and to these two parcels of real property. Claimants' various contentions in this regard, and the counter-arguments of the United States, will be analyzed separately.

### *Does 18 U.S.C. § 1955 Subject Real Property to Forfeiture?*

■ The Eleventh Circuit has not spoken on the question of whether or not 18 U.S.C. § 1955 is a vehicle for the forfeiture of *real* property. During oral argument, the court pointed out to the parties something none of them apparently knew, namely, that *U.S. v. South Half of Lot 7 and Lot 8, Block 14*, 876 F.2d 1362 (8th Cir.1989), had been vacated and an *en banc* rehearing ordered by the Eighth Circuit. In fact, the parties seemed to have little familiarity with that case or with the other case on point, *U.S. v. Premises and Real Property 614 Portland*, 846 F.2d 166 (2d Cir.1988). The Eighth Circuit panel opinion, prior to its being vacated, had held, contrary to the Second Circuit's cursory opinion, that 18 U.S.C. § 1955(d) does not authorize the forfeiture of *real* property even though the property is clearly proven to have been used for illegal gambling. On August 3, 1990, the Eighth Circuit finally filed its *en banc* opinion on rehearing. This opinion reverses the panel and now holds that 18 U.S.C. § 1955(d) *does* make real property, as well as personal property, an object for forfeiture. Chief Judge Lay and Judges Heaney and McMillian dissented for the reasons stated by the majority in the earlier panel opinion. *See U.S. v. South Half of Lot 7 and Lot 8, Block 14*, 910 F.2d 488, (8th Cir.1990). Although the United States was granted an extension of the date for submission of claimants' motions for summary judgment, the United States has not discussed the current status of the law respecting whether or not § 1955(d) reaches *real* property. If the United States thinks the matter is settled, this court respectfully disagrees.

■ The only reason this court brought up *U.S. v. South Half of Lot 7 and Lot 8, Block 14* during oral argument is that this court was tentatively persuaded by the logic of the Eighth Circuit panel majority, which now represents the Eighth Circuit minority. Not only does this court agree

with the ultimate dissenters of the Eighth Circuit, but it agrees with the Eleventh Circuit in *U.S. v. $38,000*, 816 F.2d 1538, 1547 (11th Cir.1987), which joins the Eighth Circuit dissenters in holding that forfeitures are not favored in the law and should be enforced only when within both the letter and spirit of the law. The Eighth Circuit minority correctly cites *U.S. v. One Ford Coach*, 307 U.S. 219, 226, 59 S.Ct. 861, 865 (1938) for this same proposition. This court also believes that criminal conduct by a property owner is the *sine qua non* for any proposed forfeiture of his property. *Adequate* procedures must be *strictly* followed. Lastly, this particular forfeiture statute has a quasi-criminal character and must be construed under the rule of lenity, giving the benefit of any doubt to the putatively accused. *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980). As pointed out in *U.S. v. U.S. Currency*, 626 F.2d 11, 18 (6th Cir.1980), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 290 (1980), § 1955(d) appears *within the criminal code* and "proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal for Fifth Amendment purposes." (quoting from *U.S. v. U.S. Coin & Currency*, 401 U.S. 715, 718, 91 S.Ct. 1041, 1043, 28 L.Ed.2d 434 (1970).

Without any Eleventh Circuit or Supreme Court precedent to look to, this court must look to the general rules of statutory construction and to its own sense of rectitude, and it must evaluate the opinions of the Second Circuit and of the two factions of the Eighth Circuit based on their competing persuasive qualities. As already confessed, this court is persuaded by the logic of the Eighth Circuit dissent and therefore finds that § 1955(d), which nowhere uses the term "real property," was not available to the United States in this instance as a statutory vehicle for forfeiture.[1]

1. The court notes that on August 23, 1990, the Eighth Circuit claimants in *South Half of Lot 7 and Lot 8, Block 14* asked the Eighth Circuit for

*Assuming Arguendo That § 1955(d) Permits The Forfeiture of Real Property, Are Parcels 2 and 4 Being Taken Without Due Process of Law?*

■ *Inter alia,* the Fifth Amendment provides that "no person shall ... be deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation."

Early in this case, the Smiths filed a motion pursuant to Rule 12(b)(6), seeking a dismissal of the action. Their motion was overruled, although it possessed arguable merit. None of the claimants has waived possible procedural shortcomings by the United States or possible constitutional or statutory defects in the forfeiture procedures. Has the government provided "due process"?

The Eleventh Circuit has revealed very plainly its insistence that all constitutional, statutory, and administrative procedural requirements be followed to the letter in forfeiture proceedings. The leading case is *United States v. $38,000, supra,* wherein the Eleventh Circuit said:

> ... the application of these rules [the Supplemental Rules for Certain Admiralty and Maritime Claims] to section 881 forfeitures [and § 1955 forfeitures?], has created a procedural morass—a morass in which the parties to the instant action became hopelessly entangled.

816 F.2d at 1540.

\* \* \*

Courts consistently have required claimants to follow the language of the Supplemental Rules to the letter. We see no reason to apply a less stringent standard to the government when it seeks forfeiture. If anything, the burden on the government to adhere to the procedural rules should be heavier than on claimants. Forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required.

a stay of the mandate, suggesting an intention to petition the Supreme Court for a writ of certiorari.

Applying the plain language of the Supplemental Rules, we conclude that the government never properly executed process.

*Id.* at 1547 (citations and footnotes omitted).

\* \* \*

Moreover, even were we tempted in some cases to permit the government to remedy a past procedural error by obtaining a warrant, we are not so inclined in the instant case.

*Id.* at 1547, n. 19.

We are not unsympathetic to the government's strong desire to eradicate drug trafficking [illegal gambling?]: we recognize that illegal drugs pose a tremendous threat to the integrity of our system of government. *We must not forget, however, that at the core of this system lies the Constitution, with its guarantees of individuals' rights.* We cannot permit these rights to become fatalities of the government's war on drugs [illegal gambling?].

*Id.* at 1548–49 (emphasis supplied).

As the Eleventh Circuit made clear in *Jones v. Preuit & Mauldin,* 808 F.2d 1435 (11th Cir.1987), 822 F.2d 998 (11th Cir. 1987), and the cases cited therein, a prejudgment seizure of property without any pre-seizure hearing raises severe "due process" concerns. This is the main thrust of the very recent *U.S. v. A Leasehold Interest in Property Located at 850 S. Maple, Ann Arbor, Washtenaw County, Mich.,* 743 F.Supp. 505 (E.D.Mich.1990), in which Chief Judge Cook relied on a local rule which requires that in *in rem* actions the party seeking the seizure certify to the court *prior* to the contemplated action that "exigent circumstances" exist which would make a pre-judgment review "impractical." Judge Cook found the seizure there to have violated this rule and "due process" standards. The wise local rule of the Eastern District of Michigan is very similar to the rule recognized by the Eleventh Circuit in *Jones v. Preuit & Mauldin* and runs parallel with the thinking of the Supreme Court of Alabama in *Reach v. State of Alabama,* 530 So.2d 40 (Ala.1988), cited by the Smiths. Perhaps one of the most recent cases on point is *Pinsky v. Duncan,* 898 F.2d 852 (2d Cir.1990), in which the Second Circuit finds that Connecticut's statute purporting to permit the prejudgment attachment of real property upon a plaintiff's *ex parte* showing that there is probable cause to sustain the validity of the claim violates "due process" because it did not contain the further requirement of "extraordinary circumstances." This is both reminiscent of the local rule of the Eastern District of Michigan and of *Jones v. Preuit & Mauldin.*

It would be strange indeed if more "due process" is required of the fifty states under the Fourteenth Amendment than is required of the United States under the Fifth Amendment.

Parcel 4 was actually seized under an order entered on October 2, 1989, describing Parcel 4 as follows:

Commence at the NE corner, Block 33, then West 66 feet to point of beginning continuing West 22 feet, South 135 feet, East 22 feet, North 135 feet, West 22 feet to point of beginning; also commencing at the NE corner, Block 33, then South 330 feet, West 210 feet to point of beginning continuing West 21 feet, North 20 feet, East 21 feet, South 20 feet to point of beginning in Section 8, Township 3, Range 4, Limestone County, Alabama.

Then, in the immediately following warrant addressed to the United States Marshal, Parcel 4 was described as follows:

Commence at the NE corner, Block 33, then West 66 feet to point of beginning continuing West 22 feet, South 135 feet, East 22 feet, North 135 feet, West 22 feet to point of beginning; also commencing at the NE corner, Block 33, then South 330 feet, West 210 feet to point of beginning continuing West 21 feet, North 20 feet, East 21 feet, South 20 feet to point of beginning in Section 8, Township 3, Range 4, Limestone County, Alabama.

Situated, lying and being in the NE 1/4 of NE 1/4 of Section 17, Township 8

South, Range 11 West, Franklin County, Alabama.

EXCEPTIONS AND RESERVATIONS: (1) The easement 45 feet in width above described is a non-exclusive easement which is also access to the adjoining property on the South side.

The first legal description of Parcel 4 employed by the government clearly placed the property in Limestone County, whereas the description in the warrant is both different and ambiguous in that, for the first time, it strangely mentions Franklin County. This ambiguity may explain the need to amend the description of Parcel 4 in an amendment to the complaint filed on October 19, 1989. That amendment finally describes Parcel 4 as follows:

A store house and lot in the City of Athens, Alabama, described as beginning at a point on the south property line of Washington Street 66.6 feet West of the Northeast corner of Block No. 33, according to the map of said City made by Henderson & Carter in the year 1897, and running thence from the point of beginning West along Washington Street 22 feet, thence South parallel to Marion Street 167.8 feet to the J.W. Calvin line, thence east with it 22 feet, thence north 167.5 feet to the point of the beginning.

ALSO, all that part of the following described strip of land which lies immediately South of the above described tract: A strip of land off of the North side of Lot No. 8 (being between a brick building and the South boundary of Lot No. 9, fronting 1 foot and 2 inches on Marion Street and running back to the rear of said lot to a point on the boundary line between Lots 7 and 8, 9 inches South of the Northwest corner of said Lot No. 8, the said strip so conveyed is off of the North side of said Lot and is 1 foot and 2 inches wide on the East boundary and 9 inches wide on the West boundary of said Lot 8. It is not the intention to convey any part of the North wall of the brick building situated on said lot, nor any of the land upon which the said building is situated.

The above described property is subject to an alley running through the Southern part thereof described as follows: Beginning at a point 21½ feet North of the Northeast corner of Lot No. 8 of Block 33, according to the 1914 Map of the City of Athens, Alabama, said beginning point being at the Northeast corner of a brick building and running thence North 11½ feet to the North side of the alley, thence West with the North line of said alley to the West line of Lot 13 of Block 33, thence South 11½ feet to a point 21½ feet north of a northwest corner of Lot 7 of said Block 33′and running thence East with the South line of said alley to the point of beginning, being a strip 11½ feet wide running East and West through the North half of said Block 33 from South Marion Street to South Jefferson Street, the intention being to except only that portion of the property now used as a public alley, and it being the further intention that the property hereby described does not encroach upon any existing building.

Unfortunately for the United States, this amendment of October 19, 1989, not only fails to mention the county in which the parcel is located so as to place it in the Northern District of Alabama, but it contains no verification. It is impossible from the file to determine what legal description, if any, was actually used by the U.S. Marshal in serving his *in rem* notice or in his notice as published in the four separate newspapers ordered by the court on October 2, 1989. In fact, there is no indication at all that there was any service of process whatsoever of the amendment of October 19, 1989. Not until March 14, 1990, two days after this court's opinion of March 12, 1990, did the Marshal finally make a purported return indicating that he had published notice in the four newspapers ordered by the court five months earlier; however, the said return conspicuously did not attach copies of the newspaper notices themselves, much less verified copies. Therefore, it is impossible to ascertain the legal descriptions which were used in any publication of notice, or the actual content of the notices. For aught appearing, the

notices involving Parcels 2 and 4 as published did not contain any specification of a time within which claimants must answer or file a claim. Thus, the "procedural morass" spoken of in *U.S. v. $38,000*, a case which, interestingly, the United States itself cited and acknowledged in its original motion asking for a warrant of arrest as a self-admonition to dot its "i's" and to cross its "t's," engulfed the case from its inception. No title insurance company in its right mind would insure the title to a purchaser at a Marshal's sale of Parcel 2 or Parcel 4 based on such a record until the last appellate avenue is exhausted by every claimant.

In passing, the court points out that § 1955 makes no distinction between real properties according to their size or value, assuming, that is, that real property is vulnerable to forfeiture. According to the United States, a 100,000 acre ranch can be forfeited if a few cowboys, with the rancher's knowledge, use the bunk house for a state precluded card game; or the Empire State Building can be forfeited if one of its tenants, with the owner's knowledge, sells lottery tickets while selling even riskier securities. This is another good reason why Congress probably did not intend to include *real* property as property forfeitable under § 1955, even though this reason was not articulated by the Eighth Circuit dissenters.

The Smiths have complained that a sizeable sum of money and bonds was seized along with Parcel 4. The court is without jurisdiction to consider their complaint in this regard, but they raise a question, here pertinent, raised by defendant in *United States v. Noriega*, 746 F.Supp. 1541 (S.D. Fla.1990), in which the defendant successfully claimed that leaving an accused with only the clothes on his back, so as effectively to deny him competent counsel, denies him the "due process" guaranteed by the Fifth Amendment. In *Noriega*, the learned trial judge found that the use of the forfeiture statute had not only deprived defendant, as a practical matter, of the opportunity to contest the government's pre-trial restraint of his assets but had also deprived him of assets needed to retain the counsel guaranteed him by the Sixth Amendment. Now that Andy Smith has been indicted three days after his motion for summary judgment came under submission, the *Noriega* case takes on meaning in this case that it did not previously have. Although *Noriega* can be distinguished factually from this case, the passage of nearly a year from the date of the seizure of Parcels 2 and 4 without any indictment except for the recent indictment of Andy Smith, but with a serious interim need for competent civil and criminal counsel by all four property owners, does implicate the "due process" clause of the Fifth Amendment.

Often the question of whether or not a particular seizure has been accomplished while at the same time affording "due process," is a difficult one. This court believes in this case that the taking of the Smiths' and the Sharpes' real property for nearly a year without the government's being in a position honestly to request a final hearing on the question of "probable cause," and, to the contrary, being required to request a stay, does not comply with the requirements of "due process."

In *U.S. v. Eight Thousand Eight Hundred and Fifty Dollars*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), cited by the government in its brief, the Supreme Court spoke to the *reasonableness* of a delay in the *filing* of the forfeiture action. The Court there adopted the test in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), for the "speedy trial" right. Of course, the right to a speedy trial is not directly implicated until an indictment is handed down, as is now the situation with respect to Andy Smith. However, when a prospective criminal defendant has his real property seized under a quasi-criminal statute without any opportunity, as a practical matter, for obtaining a "due process" hearing for nearly a year, the reasonableness of the delay, analogous to the requirement of a "speedy trial" under the Sixth Amendment, must become a factor in the "due process" analysis. This is particularly true in this case, where the court actually warned the United States

that it must step more lively or risk a dismissal.

In its brief responding to claimants' separate motions for summary judgment, the government argues that the claimants have not shown any *prejudice* from the delay; that the delay "was not unjustified"; and that "accordingly, no due process violation has occurred." Government's brief, p. 5. The same brief admits that Parcel 4 "contains a family-run business that has been in operation for approximately seventy years." Government's brief, p. 9. The Smiths' business is a clothing store, for which it is commonly understood to be impossible, as a practical matter, to buy merchandise to prepare for the various fashion seasons while a sword of Damocles hangs over the business. There is a gracious plenty of prejudice to the Smiths resulting from the delay in the final title quieting to Parcel 4, without even considering the fact that the Smiths have been paying taxes and maintaining the premises for nearly a year while the sword dangles. The fact that Andy Smith has now been indicted can only cause further prejudicial delay, especially if he is convicted and takes an appeal. Thomas Ray Smith, the joint owner with his brother, neither has been indicted nor granted immunity. Yet, he could be dispossessed tomorrow if the government chooses. As to Parcel 2, the prejudice to the Sharpes resulting from the delay is even more conspicuous, despite the stipulation for continued occupancy. Neither Sharpe has been indicted. If the forfeiture of Parcel 2 is validated, the Sharpes have for eleven months only been building equity for the government by making the mortgage payments. Both of the mortgagees on Parcel 2 have, through counsel, filed claims. Who does the government think will pay the attorney's fees resulting from these lenders' having to employ lawyers to file these claims, even if the Sharpes are eventually successful? Every monthly mortgage payment, and every payment of taxes, constitutes "prejudice" in that the payments would not have been made by the Sharpes if the government legally owns Parcel 2; and the government has notably not offered to make the tax and mortgage payments in order to protect it against foreclosure of admittedly valid mortgages. Although the government has come close to promising that it will indict Leland Sharpe in the near future, it does not offer his wife immunity or any realistic opportunity for a "probable cause" hearing in the near future, or an opportunity to prove her personal innocence.

The government would excuse the delay in the "probable cause" hearing by its unverified assertion that "it took approximately eight months for the plaintiff to prepare copies of the numerous tape recordings and transcripts of federal wiretaps, generated as a result of the related criminal investigation ..." Government's brief, p. 4. This court finds this assertion both incredible and inexcusable. It either indicates little or no regard for claimants' property rights or that the government investigators and their stenographers have been too slow. There cannot be a different "due process" standard for litigants, one for the government and another for property owners. If there is to be a difference, the more stringent "due process" standard must apply to the government, because the Fifth Amendment constitutes a limitation on the government.

### What is the Effect on "Due Process" of the Self–Incrimination Aspect Of the Fifth Amendment?

The Fifth Amendment not only requires that the government afford "due process" and pay "just compensation" before any taking of private property, but it says: "No person ... shall be compelled in any criminal case to be a witness against himself...." In this case, the "due process" and the "self-incrimination" provisions of the Fifth Amendment are so intertwined as to be inseparable. They must be examined as a unit.

Either the United States requested the stay of the "probable cause" hearing because it was unprepared to pursue its civil case (its original affidavits are, in large part, hearsay), or, more likely, because it recognized that a criminal target cannot be placed in the position of having to make the

Hobson's choice between relinquishing valuable real property on the one hand, and seriously exposing himself to possible self-incrimination on the other. The United States cannot be heard to argue that it has an unlimited amount of time within which to prosecute a person for alleged illegal gambling, while at the same time claiming to own that person's real property because of the gambling activity. Such a criminal target is effectively blocked from pushing the forfeiture proceeding to an expeditious conclusion by his reasonable choice to exercise the crucially important constitutional privilege against self-incrimination. In *Pervis v. State Farm Fire and Cas. Co.*, 901 F.2d 944 (11th Cir.1990), the Eleventh Circuit recently reiterated the obvious principle that the Fifth Amendment shields a defendant in a civil case from having to submit to interrogation if his testimony might tend to incriminate him, even though his refusal has the effect of interrupting the progress of the civil action. This principle, of course, does not apply if the potential criminal target is the *plaintiff* in the civil action. In this particular civil forfeiture proceeding, however, the *government* is the *aggressor*, so that the Smiths and the Sharpes enjoy the absolute Fifth Amendment shield, and cannot be criticized, as the government's brief implicitly does, for holding up that shield.

The Sixth Circuit in *United States v. U.S. Currency*, 626 F.2d 11 (6th Cir.1980), dealt specifically with a forfeiture undertaken under 18 U.S.C. § 1955. The Sixth Circuit concluded, with compelling logic and authority, that occasions do exist in which the constitutional privilege against self-incrimination precludes the effectuation of the § 1955 forfeiture scheme.[2]

---

**2.** [W]hile [*United States v. U.S.*] *Coin and Currency* [401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971)] obviously concerns certain of the issues presented before this court—specifically, self-incrimination in the forfeiture context—*Coin and Currency* does not control, nor mandate dismissal of, the case at bar without any trial as ordered by the District Court.

It is clear, however, that there are genuine threats to appellees' privilege against self-incrimination in the matter sub judice. Our focus must turn, then, to whether such threats justify dismissal of the forfeiture proceeding, or whether, as the appellant suggests, there may be "a solution which both protects the privilege and permits the forfeiture case to go forward."

The government states:

... appellees have the right to invoke the privilege against self-incrimination. It follows from this that no sanction may be imposed as a result of relying on the privilege.... We recognize that it would be a deprivation of fundamental rights to prevent appellees from attempting to prove their claims to the property merely because they may legitimately invoke their Fifth Amendment rights with respect to some of the questions in the interrogatories filed below. By this we mean that appellees should not have to choose between waiving their privilege against self-incrimination in order to satisfy their burden of proof, and remaining silent, thereby giving up the opportunity to prove their claims to the property at issue in this case. Brief p. 9.

Therefore, the government concedes that the appellees do have a privilege against self-incrimination in this situation, and seems to acknowledge, in its brief and at argument, that the court

below was correct in ruling that appellees were not required to answer the interrogatories. The government vigorously maintains, however, that the District Court erred in dismissing the forfeiture action without any trial.

It is settled that "a witness in a ... civil ... proceeding may decline to answer questions when to do so would involve substantial risks of self-incrimination." *United States v. Parente*, 449 F.Supp. 905, 907 (D.Conn.1978); *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1086 (5th Cir.1979). "Although the proceeding in which the privilege is asserted need not be criminal, the information for which the privilege is claimed must harbor the potential of exposing the speaker to a criminal or quasi-criminal charge." *In re Daley*, 549 F.2d 469, 478 (7th Cir.), *cert. den.*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977). Indeed, "it is only when there is but a fanciful possibility of prosecution that a claim of fifth amendment privilege is not well-taken." *In re Folding Carton Anti-trust Litigation*, 609 F.2d 867, 871 (7th Cir.1979). As the court in *United States v. Powe*, 591 F.2d 833, 845 n. 36 (D.C.Cir.1978) has explained, the "privilege operates where the information sought to be extracted presents 'a realistic threat of incrimination' ... as distinguished from 'a mere imaginary possibility.'" See also *Wehling, supra* at 1087 n. 5. It is evident here that appellees face a very "realistic threat of incrimination."

The Supreme Court has declared that:

"... government cannot penalize assertion of the constitutional privilege against self-incrimination by imposing sanctions to compel testimony which has not been immunized ... the touchstone of the Fifth Amendment is compulsion, and direct economic sanctions and imprisonment are not the only penalties

In *U.S. Currency*, the Sixth Circuit suggested, as an alternative solution to the problem, that is, if the problem is solvable, that the government grant claimants immunity from prosecution in exchange for the right to proceed with the forfeiture action. No such suggestion has come from the United States in the instant case. Another, if weaker, alternative is a stay of the civil case until the completion of the criminal prosecution, but such an alternative presupposes the beginning and ending of the criminal prosecution *within a reasonable period of time.* And, considering the fact

capable of forcing the self-incrimination which the Amendment forbids." *Lefkowitz v. Cunningham,* 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977).

See also *SEC v. Gilbert,* 79 F.R.D. 683 (S.D.N.Y. 1978). "The Supreme Court has disapproved of procedures which require a party to surrender one constitutional right in order to assert another." *Wehling, supra* at 1088. Further, "a prosecutor may not circumvent a person's privilege against self-incrimination by invoking a civil remedy to enforce a criminal statute." *Childs v. McCord,* 420 F.Supp. 428, 433 (D.Maryland 1976), *aff'd* 556 F.2d 1178 (4th Cir.1977). As the Seventh Circuit explained in *Ryan v. C.I.R.,* 568 F.2d 531, 542 (7th Cir.1977), *cert. den.,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978), ". . . the forfeiture penalty is closely related to a criminal sanction, and the privilege against self-incrimination is operative." The forfeiture cases have served to "extend the Fifth Amendment privilege to proceedings which, although civil in form, involve the enforcement of a statute 'intended to impose a penalty only upon those who are significantly involved in a criminal enterprise.'" *Childs, supra* at 434.

Furthermore, as the Fifth Circuit has observed, "under the federal discovery rules, any party to a civil action is entitled to all information relevant to the subject matter of the action before the court *unless such information is privileged.* Fed.R.Civ.P. 26(b)(1). Even if the rules did not contain specific language exempting privilege information, . . . the Fifth Amendment would serve as a shield to any party who feared that complying with discovery would expose him to the risk of self-incrimination." *Wehling, supra* at 1086 (original emphasis); see also *Ryan, supra* at 538.

In the instant appeal, the Government has said:

Due to the peculiar nature of a forfeiture action, in which the burden of proof shifts to a claimant after the government has shown probable cause for the complaint, we agree that appellees could not, in proper circumstances, be forced to surrender the privilege (against self-incrimination in) answering the complaint and offering evidence in support of their claims to the property. Brief p. 8.

This court recognized the "peculiar nature" of such proceedings in *Colonial Finance Co. v. United States,* 210 F.2d 531, 533 (6th Cir.1954), noting that, in forfeiture actions, ". . . when probable cause has first been shown for the institution of such suit or action, to be adjudged by the court, the burden of proof shall lie upon the claimant."

The court in *Tom v. Twomey,* 430 F.Supp. 160, 163 (N.D.Ill.1977), considered some of the procedural aspects of forfeiture under the statute involved herein:

The forfeiture of any property used in violation of 18 USC 1955(a) is governed by the custom laws. 18 USC 1955(d). In the law of customs, if an action in rem is brought to forfeit a vehicle, the owner on being notified of the proceeding . . . is required to file a timely answer to the government's complaint, under oath . . . The answer should set out clearly and explicitly the facts relied on . . . And the failure to deny by answer is an admission.

Along the same vein, Judge Feikens, in view of the analogous situation presented in *Backos v. United States,* 82 F.R.D. 743, 745 (E.D.Mich. 1979), expressed concern that:

. . . by refusing to testify, plaintiffs will hurt their claim because they will be deprived of whatever benefit their own evidence might provide. Moreover, . . the government may be able to draw an adverse inference from plaintiff's refusal to testify.

The foregoing demonstrates that, especially in light of the posture of a forfeiture proceeding, in which the defendant actually has the burden of proof, the appellees here have the unenviable choice of incriminating themselves, or, of failing to file an answer, under oath, to the government's complaint and failing to vigorously pursue their claims to the currency.

Clearly, appellees should not be compelled to choose between the exercise of their Fifth Amendment privilege and the substantial sums of money which are the subject of this forfeiture proceeding. On the other side of the coin, however, the government should not be compelled to abandon the forfeiture action which Congress, by enacting the statute, obviously intended to create. Therefore, the courts must seek to accommodate both the constitutional right against self-incrimination as well as the legislative intent behind the forfeiture provision.

There may be occasions when the constitutional privilege totally precludes effectuation of the statutory forfeiture. In other words, it is possible that, under certain circumstances, forfeiture would be impossible without impermissibly impinging upon the Fifth Amendment privilege, and, although it does not appear so to this court, this may be one such situation.
*Id.* at 14–16.

that two of these claimants apparently are never going to be prosecuted, and that those who are going to be prosecuted have the right to appeal from a conviction without waiving their Fifth Amendment right, the reasonableness of the delay under the eye of the Fifth Amendment's privilege against self-incrimination becomes even more questionable.

Another problem inhering in a lengthy *stay* as the "solution" to the Fifth Amendment problem is that if the property owner should be convicted he automatically becomes collaterally estopped from interposing his "innocent owner" defense in the civil case. *See U.S. v. One Rural Lot Located at Calle Principal (A) No. 296*, 739 F.Supp. 74 (D.Puerto Rico 1990). Another Hobson's choice? It may be good strategy in the criminal case to choose not to testify in light of the presumption of innocence and the fact that the government has the burden of proving guilt beyond a reasonable doubt, whereas in the civil proceeding the government's burden is much lighter and, if met, the owner has the burden of proving the essential elements of his claim by a simple preponderance of the evidence. The bargaining power of the accused in his criminal case is materially diminished by the pendency of the forfeiture proceeding if the forfeiture scheme is employed as in this case. If this was what Congress had in mind, it was overstepping the constitutional constraints on prosecutorial freedom.

Although not in the context of a forfeiture, in analogous Internal Revenue Service civil enforcement proceedings under 26 U.S.C. § 7602, courts have barred a civil proceeding once the IRS has referred the matter to the Department of Justice for criminal prosecution. *See U.S. v. Michaud*, 907 F.2d 750 (7th Cir.1990). The Seventh Circuit in *Michaud* recognized that civil proceedings cannot continue after criminal proceedings begin without violating the privilege against self-incrimination. The principle is simple and easy to understand. The Fifth Amendment cannot be swept under the rug, either by the courts or by Congress, simply in the name of convicting law violators.

Perhaps the most recent case closely paralleling the instant case is *In re Ramu Corp.*, 903 F.2d 312 (5th Cir.1990). In *Ramu*, the Fifth Circuit severely criticized the United States for seizing real property owned by unindicted persons and then procuring the trial court to put "on hold" the forfeiture proceeding pending the outcome of a criminal case. The only real difference between *Ramu* and this case is that the proposed forfeiture in *Ramu* was under the Comprehensive Drug Abuse Prevention and Control Act, which in 21 U.S.C. § 881(i) expressly *permits* a stay of the forfeiture proceeding related to a drug offense for which there has been an indictment and for which the government can show *good cause.* The forfeiture statute here invoked for a gambling violation *contains no such provisions.* Yet, even in *Ramu* the Fifth Circuit found that the United States failed to satisfy the requirements for a stay pending the criminal narcotics prosecution, because the government had not shown that no substantial harm would be suffered by the property owner as a result of the stay. In the case before this court the United States has offered no more than its bald assertion that it needs more time to complete its investigation in order to prosecute. This explanation does not satisfy the two different Fifth Amendment concerns articulated so well in *Ramu* and in *$38,000*, much less both concerns in combination.

### Conclusion

The United States, perhaps with inadvertent Congressional help, has, to use the Eleventh Circuit's words in *$38,000*, become entangled in a procedural morass from which it cannot extricate itself, that is, without this court's unwanted help. For the separate and several reasons discussed above, this court will pull the United States from its tar baby and will grant claimants' motions for summary judgment.